**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

**DEVON BERNARD HARROD**
210 South Smallwood St
Baltimore, Maryland 21230

    *Plaintiff,*

 v.

**MAYOR AND CITY COUNCIL**
**BALTIMORE CITY**
Andre M. Davis
City Solicitor
City Hall - Room 250
100 N. Holliday St,
Baltimore, Maryland 21202

**BALTIMORE POLICE DEPARTMENT**
Gary Tuggle
Interim Police Commissioner
601 East Fayette Street
Baltimore, Maryland 21202

**EVODIO C. HENDRIX**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
Inmate No. 62927-037
Devens Federal Medical Center
42 Patton Road
Ayer, Massachusetts 01432

**WAYNE EARL JENKINS**
*Individually and in his Official*
*Capacity as a Baltimore City Police Officer*
Inmate No. 62928-037
Pollock Federal Correctional Institute
1000 Airbase Road
Pollock, Louisiana 71467

and

**DEPUTY COMMISSIONER**
**DEAN PALMERE**
*Individually and in his Official*
*Capacity as a Deputy Commissioner for*
*For Baltimore Police Department*

**\*Jury Trial Demanded\***

Civil Case No.: _____

1323 Crofton Drive, Lot 22
Bel Air, Maryland 21014

> *Defendants.*

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff Devon Bernard Harrod, by and through his attorneys, Cary J.

Hansel, Justin Stefanon, and the law firm of Hansel Law, P.C., and sues the above-named

Defendants, and as cause therefor states the following:

## INTRODUCTION

Plaintiff Devon B. Harrod was victimized by members of the Baltimore Police

Department, namely former officers Evodio Hendrix and Wayne Jenkins, who have both since

been convicted for engaging in corrupt activities including falsifying evidence and are currently

serving time in federal prisons.  Hendrix and Jenkins planted a gun in a vehicle near where Mr.

Harrod was talking to a friend and coerced Mr. Harrod into falsely confessing that the gun was

his.  Mr. Harrod served over thirteen months in prison until after the extreme corruption of these

two officers was revealed to the public, and his charges were dismissed *nolle prosequi.* These

two officers performed their criminal acts against the broader backdrop of a police department

which condoned and/or actively promoted the violation of citizens' rights as ordinary practice.

This pattern and practice of permitting corruption was exemplified by the actions of Deputy

Commissioner Palmere, who coached officers under his supervision on how to testify in order to

avoid accountability for violating the rights of citizens.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction pursuant to its powers to resolve federal questions under 28 U.S.C. § 1331.

2.      Venue is proper in this Court because all of the material events occurred in Baltimore City, Maryland, which is in this district.

3.      The Complaint is filed within three years of the cause of action.

4.      The amount in controversy exceeds $75,000.

## PARTIES

5.      Plaintiff Devon B. Harrod (hereinafter 'Mr. Harrod' or 'Plaintiff'), is, and was at all times relevant to the occurrence complained of herein, an adult resident of the State of Maryland.  Mr. Harrod is the aggrieved party in this suit and resides at 210 South Smallwood Street, Baltimore, Maryland 21230.

6.      Defendant Evodio C. Hendrix (hereinafter 'Hendrix') was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.

7.      Defendant Wayne Earl Jenkins (hereinafter 'Jenkins') was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a police officer having the rank of sergeant, and at all times relevant hereto was acting in his official capacity as a police officer and under the authority and color of law.  At the time of Mr. Harrod's arrest, Jenkins was the Officer in Charge ('OIC') of a Special Enforcement Section of the Baltimore Police

Department.  On June 13, 2016, he became the OIC of the Gun Trace Task Force ('GTTF') of the Baltimore Police Department.

8.      Defendant Deputy Commissioner Dean Palmere (hereinafter 'Deputy Commissioner Palmere') was, at all times relevant to the occurrences complained of herein, an adult resident of the State of Maryland, employed by Baltimore City, Maryland, through the Baltimore Police Department as a Deputy Commissioner of the Baltimore Police Department, and at all times relevant hereto

9.      Defendant Baltimore City is a body politic and corporate body that may sue and be sued.

10.      Defendant Baltimore Police Department (hereinafter 'BPD') is a public entity established under the laws of Maryland to be sued in its own name.

## FACTS COMMON TO ALL COUNTS

11.      On or about August 20, 2015 at around 10:00 p.m., Mr. Harrod was at or near the intersection of West Lexington Street and North Poppleton Street in Baltimore City, Maryland speaking to some friends when he was approached by two Baltimore City Police officers he did not know.

12.      Mr. Harrod had been speaking to his friend Aron Johnson; Mr. Johnson was parked at the curb in his Acura MDX (hereinafter 'the vehicle') with the driver's door open and Mr. Harrod was on the street near the driver's door.

13.      One of the two BPD officers, who upon information and belief were defendants Hendrix and Jenkins, immediately instructed Mr. Harrod to "walk off", with which instruction he immediately complied by walking away from the friends he was speaking with.

14.     As he was walking away, Mr. Harrod became concerned for the well-being of his friends, and decided to turn around and walk back toward the vehicle. He saw the police officers searching Mr. Johnson's car.  Mr. Johnson remained in his driver's seat throughout the search, while the police searched the front and back of the vehicle.

15.     When Mr. Harrod returned, the police officers said that they had found a handgun in the back seat of the vehicle and that the officers believed that either Mr. Johnson or Mr. Harrod had been in possession of the gun.  The police officers told Mr. Harrod and his friend that they intended to arrest one of them for possession of the handgun, saying "one of y'all gonna take this gun."

16.     Mr. Harrod had never seen the gun before, had not been sitting in the aforementioned vehicle, could not have thrown the gun into the back of the vehicle from where he had been standing, and had no idea whose gun the police claimed to have found.

17.     Mr. Harrod did not believe that Mr. Johnson had a gun or that he would leave a gun sitting out in the open in the backseat of his car, and suspected the police had brought the gun themselves.

18.     Defendants Hendrix and Jenkins engaged in an aggressive interrogation of Mr. Harrod and Mr. Johnson in an attempt to have one of them claim ownership of the gun.  This interrogation took place right on the sidewalk near the parked vehicle, and included defendant Jenkins drawing his service weapon and pointing it at Mr. Harrod and Mr. Johnson, going so far as to place the gun against Mr. Johnson's forehead.  See Exhibit 1 - Affidavit of Aron Johnson.

19.     Defendants Hendrix and Jenkins threatened Mr. Harrod and Mr. Johnson that the defendants would charge them with both the possession of the handgun and with a recent, unidentified murder if they refused to make a false confession that the gun was theirs, even

though they had claimed to having just found the gun and should have had no idea whether it was tied to any murder or not.  Id.

20.     Mr. Harrod knew that there had been several recent murders in the area, including one in which his own young, female cousin had been shot and wounded in the crossfire.

21.     Mr. Harrod knew that Mr. Johnson had several prior convictions and did not want to falsely claim that the gun was Mr. Johnson's, merely to save himself.

22.     Mr. Harrod, not knowing where the gun came from, could not know whether it may actually have been used to commit a crime or a murder, but he feared the officers may have had reason to know if the gun was used to commit a crime.

23.     Despite the fact that they had initially instructed him to 'walk off,' defendants Hendrix and Jenkins now claimed to have seen Mr. Harrod throw the gun in order to provide a false pretense to arrest him.

24.     Defendants Hendrix and Jenkins not only coerced Mr. Harrod into saying that the gun was his, but further instructed him to say he had thrown it through the driver's door into the back of the vehicle, in order to back up their statements that they had seen him do so.

25.     Defendants Hendrix and Jenkins coerced Mr. Harrod into making a confession on Jenkins' cell phone camera, right there on the sidewalk.  He was subsequently arrested and they took him to booking.  Id.

26.     Mr. Johnson was not arrested or charged, but Hendrix and Jenkins stole over a thousand dollars of cash that they found in his possession.  Id.

27.     Mr. Harrod was charged with various counts related to gun possession.  On April 4, 2015, the day of his trial, both of the officers came to court intending to testify against Mr. Harrod.  Fearing a long prison sentence due to a prior felony conviction, Mr. Harrod accepted a

plea deal on that day of five (5) years, eighteen (18) months of which he would serve and the remainder would be suspended.

28.     On or about March 1, 2017, Federal prosecutors indicted seven members of the BPD's Gun Trace Task Force, including officers Hendrix and Jenkins, the individual Defendants in this case.  The officers were indicted on an assortment of racketeering and conspiracy charges stemming from, among others, planting guns and drugs on suspects and other instances of fabricating or altering evidence.  See Exhibit 2 – Indictment.

29.     On May 22, 2017, Mr. Harrod's case was activated for further proceedings, his case was closed with all counts dismissed *nolle prosequi*, and he was freed having served just over thirteen (13) months of his previous sentence.

30.     On or about July 21, 2017, defendant Hendrix entered a guilty plea in his Federal criminal case.  See Exhibit 3 – Hendrix plea agreement.

31.     On or about January 5, 2018, defendant Jenkins entered a guilty plea in his own Federal criminal case. See Exhibit 4 – Jenkins plea agreement.

32.     As a result of the Defendants' actions, Plaintiff was wrongfully convicted and served over thirteen months in prison.  Plaintiff has suffered, and continues to suffer, mental anguish, emotional pain and suffering, and financial loss due to his unlawful incarceration at the hands of corrupt police officers.

33.     Defendants' actions were outrageous and beyond the bounds of decency.

34.     Defendants' acts abused their power and were used to oppress Mr. Harrod.

35.     Defendants' acts were a foreseeable cause of the injuries sustained by Mr. Harrod.

36.     At all times relevant hereto, Defendants subjected Mr. Harrod to the deprivation of his rights with actual or implied malice, in an unreasonable and unnecessary fashion.

37.     Defendants' acts shocked the conscience and amount to an inhumane abuse of power, thereby subjecting Mr. Harrod to a deprivation of his constitutional rights and privileges.

38.     At all times relevant hereto, Defendants acted without legal justification or excuse.

39.     At all times relevant hereto, Defendants acted with an evil and rancorous motive, influenced by hate, the purpose being to deliberately and willfully injure Mr. Harrod, and by their intent to use their authority for their own pecuniary gain.

40.     At all times relevant hereto, Defendants acted deliberately, with ill will, improper motive, and actual malice.

41.     At all times relevant hereto, Defendants acted under color and pretense of law, and under color of statutes, customs, and usages of the State of Maryland.

42.     At all times relevant hereto, Defendants acted within the scope of their employment, with the power and authority vested in them as officers, agents, and employees of Baltimore City and BPD and incident to the pursuit of their duties as officers, employees and agents of Baltimore City and BPD.

43.     Defendants and/or any other unnamed officers committed each of the acts knowingly, intentionally, and maliciously.  As a result, Mr. Harrod is entitled to an award of compensatory and punitive damages.

44.     In the alternative, at all times relevant hereto, the Defendants acted with negligence and/or gross negligence in violation of the lawful duties owed Mr. Harrod.

45.     At no time did Mr. Harrod cause or contribute to his injuries.

46.     As a direct and proximate result of the aforesaid conduct, actions, and inactions of Defendants, as well as those stated elsewhere herein, Mr. Harrod was caused to suffer and

continues to suffer mental pain and suffering, including but not limited to, undue emotional

distress, mental anguish, humiliation, embarrassment, loss of respect, loss of society, shame, and

loss of enjoyment of life.  Mr. Harrod was caused to suffer and continues to suffer from

economic damages, including, but not limited to, lost time and wages from work, and lost

earning capacity, all to his great detriment.

47.     As a direct and proximate result of Defendants' unconstitutional acts, Mr. Harrod

suffered humiliation and extreme mental and post-traumatic emotional distress.

48.     Plaintiff further alleges that all of his injuries, losses and damages – past, present,

and prospective – were caused solely by the actions of Defendants, as set forth above, without

any negligence, want of due care, or provocation on the part of Plaintiff, either directly or

indirectly.

**FACTS RELEVANT TO CLAIMS AGAINST**
**<u>DEPUTY COMMISSIONER PALMERE, BALTIMORE CITY, AND BPD</u>**

49.     The individual defendants' conduct as alleged herein was anything but uncommon

within the BPD in the years preceding the unlawful detention and prosecution of Mr. Harrod. As

detailed below, at the time the Officers falsely arrested and maliciously prosecuted Mr. Harrod,

BPD officers routinely violated civilians' Fourth and Fourteenth Amendment rights by arresting

them without the requisite probable cause.  This behavior was not only condoned, but

encouraged, rewarded, and protected by defendants Baltimore City, BPD, and Deputy

Commissioner Palmere.

50.     Deputy Commissioner Palmere, in his position of supervisory authority over

Hendrix and Jenkins and other officers of defendant BPD, failed to enact or enforce policies to

adequately ensure that officers were not engaging in falsifying evidence, giving false testimony, coercing false confessions, and maliciously prosecuting citizens.

51.     Defendants Baltimore City and BPD, through the individuals who execute their policies such as Deputy Commissioner Palmere and other supervisors, likewise failed to enact or enforce policies to adequately ensure that officers were not engaging in falsifying evidence, giving false testimony, coercing false confessions, and maliciously prosecuting citizens.

52.     In addition to failing to enact or enforce policy that would prevent such abuses of citizens' rights, Deputy Commissioner Palmere, Baltimore City, and BPD actively enforced and promoted policies that encouraged officers such as Hendrix and Jenkins to commit such abuses and subsequently protected officers from accountability for their violations of civil rights.

53.     Deputy Commissioner Palmere personally engaged in coaching officers in how to provide testimony in court to shield themselves from allegations of civil rights violations and illegal activity such as that for which Hendrix and Jenkins have been convicted.

54.     The aforesaid policies, or lack thereof, by which the defendants condoned or displayed deliberate indifference to violations of rights and criminal actions of police officers have been exemplified in an August 10, 2016 report of the United States Department of Justice, exposing the widespread corruption and abuse within BPD. See Exhibit 5 – DOJ Report.

55.     The Department of Justice concluded that "there is reasonable cause to believe that BPD engages in a pattern or practice of conduct that violates the Constitution or federal law. BPD engages in a pattern or practice of:

a. Making unconstitutional stops, searches, and arrest;

b. Using enforcement strategies that produce severe and unjustified disparities in the rates of stops, searches and arrests of African Americans

c. Using excessive force; and

d. Retaliating against people engaging in constitutionally-protected expression."

Exhibit 5, pg. 3.

56.    In regard to discrimination against African Americans, the report specifically found that "racial disparities in BPD's arrests are most pronounced for highly discretionary offenses: African Americans accounted for 91 percent of the 1,800 people charged solely with "failure to obey" or "trespassing"; 89 percent of the 1,350 charges for making a false statement to an officer; and 84 percent of the 6,500 people arrested for 'disorderly conduct.'" Exhibit 5, pg. 7.

57.    Finally, the report made a number of findings regarding the deficient policies, training, supervision, and accountability throughout the BPD, stating, "BPD's systemic constitutional and statutory violations are rooted in structural failures. BPD fails to use adequate policies, training, supervision, data collection, analysis, and accountability systems, has not engaged adequately with the community it policies, and does not provide its officers with the tools needed to police effectively." Exhibit 5, pg. 10.

58.    The report stated that "[s]tarting in the late 1990s, Baltimore City and BPD leadership expressly adopted a policing model that embraced the principles of "zero tolerance" street enforcement.  According to City and BPD leaders, past and present, as well as media reports, Baltimore City based its approach in part on tactics developed by the New York Police Department and brought in consultants from NYPD's program to oversee its implementation in Baltimore." Exhibit 5 at 40

59.    The strategy involved BPD officers making widespread use of pedestrian stops

and searches in a purported effort to seize guns and narcotics and deter crime.  As part of the "zero tolerance" strategy, BPD leadership pressured officers to increase the number of arrests and to "clear corners," whether or not the officers observed criminal activity. Exhibit 5 at 41.

60.     BPD's implementation of "zero tolerance" resulted a massive increase in the quantity of arrests—but a corresponding decline in quality. For example, of the 100,000 arrestees that BPD processed through Central Booking in 2004, over 20% were released without charges. Id.

61.     In June 2006, the ACLU of Maryland and the NAACP filed a lawsuit alleging that BPD was illegally arresting thousands of residents every year.  The complaint asserted that BPD had not properly trained officers on the legal standard necessary to make an arrest, and had placed pressure on supervisors to bolster numbers, leading to citizens being improperly detained without probable cause. Id. at 41.

62.     In 2010, BPD and the City entered into a settlement to resolve the ACLU lawsuit, with BPD agreeing to adopt policies rejecting its former zero tolerance strategy and make changes to existing policies and procedures. Id. Notwithstanding the foregoing, BPD failed to implement changes contemplated by the 2010 settlement that were intended to curtail false arrests by BPD officers and, in so doing, perpetuated the practices first set in motion by BPD's "zero tolerance" policy. Id. at 42.

63.     Specifically, BPD's failure to engage in meaningful change was noted in the reports of an independent auditor established by the ACLU lawsuit settlement agreement. Id. After a four-year monitoring period had passed, the auditor determined that BPD had not reached full compliance on more than half of the conditions of the agreement. Id.

64.     Following the audit, it was apparent to BPD senior leadership that BPD officers were still not adequately reporting the circumstances surrounding arrests to allow for meaningful oversight of their conduct to provide any meaningful oversight of street-level enforcement activities. Id.

65.     In the years immediately preceding the arrest and malicious prosecution of Mr. Harrod, BPD's lack of supervision over street-level enforcement activities by BPD officers perpetuated an operational culture in which such constitutional violations occurred on a persistent, widespread basis.

66.     For example, data maintained by the State of Maryland shows that, from November 2010–July 2015, BPD made thousands of arrests that reviewing officials declined to act upon. Id. at 35.

67.     Analysis of this data reveals that, from November 2010–July 2015, supervisors at Central Booking released 6,736 arrestees without charges being issued. Id. Moreover, prosecutors from the State's Attorney's Office declined to charge an additional 3,427 cases, explicitly finding that 1,983 of the underlying arrests lacked probable cause. Id. In sum, BPD officers made at least 10,163 arrests that authorities immediately determined did not merit prosecution—an average of roughly 200 arrests per month. Id.

68.     However, it is clear that BPD supervisors at all levels of the chain of command were unconcerned with addressing the troubling amount of arrests being made by BPD officers in circumstances undeserving of criminal prosecution.

69.     For example, BPD incident reports regarding warrantless arrests that occurred during the same period of time reveal that BPD front line supervisors would consistently "sign off" (i.e., review and approve) subordinates' actions even when the reports describing the basis

for warrantless arrests describe egregious constitutional violations. Id. at 45.

70.     In fact, after surveying thousands of BPD arrest reports for the period of time spanning November 2010–July 2015, the United States Department of Justice ("DOJ") could not identify a single arrest questioned by a front-line supervisor. Id. DOJ investigators also determined that BPD supervisors often only conducted reviews of such incident reports for purposes of "documenting" officer activity and were unconcerned with assessing the arrest conformed to constitutional standards. Id.

71.     Yet, as noted above, the lack of oversight regarding warrantless arrests by BPD officers was not limited to the front-line supervisors. Senior BPD leadership also failed to take action necessary to provide meaningful oversight in the form of data collection and pattern analysis. Id. at 46, 134-35.

72.     Specifically, despite maintaining information on arrests in a basic database, BPD leadership failed to conduct any analysis to identify trends in the type, frequency, or quality of arrests made by particular officers or units. Id. at 46.

73.      Indeed, far from looking for problematic trends in arrest data, BPD senior leadership created a culture which encouraged officers to make as many arrests as possible in that a BPD officer's performance was often evaluated by reference to the raw numbers of stops and arrests made, particularly for gun and drug offenses. Id. at 42. This model created a personal incentive for officers to commit false arrests because many BPD officers believed that the path to promotions and favorable treatment, as well as the best way to avoid discipline, was to increase their number of stops and make arrests for such offenses. Id.

74.     BPD fails to hold its officers responsible for misconduct of the kind at issue in this case. The failure in accountability flows from various BPD practices, to include:

14

discouraging members of the public from filing complaints;

improperly classifying complaints to mask misconduct;

delaying investigations of complaints unnecessarily; and

using poor investigative techniques to gather evidence about misconduct. Id. at 140-49.

75.     With regard to discouraging members of the public from filing complaints against officers, BPD places unnecessary conditions on the filing of complaints. While the Department ostensibly accepts complaints made in person, by telephone, or over email, it requires complaints alleging many common types of misconduct—including excessive force and false arrest/imprisonment—to be signed, notarized, and filed in person at one of just a few locations throughout the City. Id. at 140. Additionally, BPD required complaints alleging excessive force must be sworn under penalty of perjury. BPD does not investigate unless these requirements are met. Id.

76.     In addition, BPD officers expressly discouraging civilians from filing complaints, sometimes mocking or humiliating them in the process. Id. at 140-41.

77.     Even when the BPD does an intake of a complaint, BPD investigators frequently misclassify those complaints as "minor allegations" so that they can be resolved by review of the chain of command as opposed to being investigated by the BPD Internal Investigation Department ("IID"). Id. at 141-42.

78.     Indeed, the majority of the approximately 38,000 allegations of misconduct made against BPD officers from 2010 through 2015 were resolved at the command level without referral to IID, resulting in significantly less investigation of those complaints. Moreover, of these 38,000 allegations, 9,694 allegations were categorized as "supervisor complaints," which require no investigation at all. Id.

79.     Accordingly, allegations handled as supervisor complaints virtually never result in discipline. Of the known 9694 "supervisor complaints" made in 2010-2015, BPD "administratively closed" 67 percent of the same and sustained just 0.27 percent of them, or 1 out of every 370 allegations. Additionally, BPD supervisors "administratively closed" 33 percent of all allegations received from 2010 through 2015—ensuring that the allegations would result in no further investigation or officer discipline. Id. at 141. These administrative closures occurred after minimal effort (and sometimes no effort at all) to contact the complainant. Id.

80.     By administratively closing complaints, BPD investigators avoid conducting any genuine investigation of the complaint and also evade BPD written policy requiring all complaints to be labeled as sustained, not sustained, exonerated or unfounded. Id.

81.     Moreover, BPD's misconduct investigations are frequently plagued by delays that compromise the evidence-gathering process and increase the likelihood that evidence of officer misconduct will not be found. Id.

82.     For example, even when BPD nominally "accepts" an external complaint and assigns the case to an investigator, the Department's practice in most cases is to not investigate that complaint until the individual appears in person at BPD's IID during business hours and participates in a formal, taped interview. Id. By declining to initiate an investigation until this occurs, BPD allows key evidence that could corroborate claims to be lost or destroyed. Id. Indeed, DOJ's review of BPD files found multiple instances in which investigators waited months before canvassing neighborhoods in which alleged misconduct occurred. Id. at 142-43.

83.     In addition to frequent delays that limit the information available about misconduct allegations, poor investigative techniques further compromise BPD's investigations. Id. at 144.  First, investigators fail to adequately consider evidence and statements from

witnesses or other officers that contradict explanations provided by officers accused of misconduct. Id. Indeed, BPD appears to apply a standard that favors officers when evaluating statements made by complainants and involved officers. Id. While BPD's Internal Affairs Manual encourages investigators to be wary of a complainant's inconsistent statements, the Department permits officers to submit addendums that clarify their original statements. Id. And when inconsistencies arise—either from such addenda or other evidence—investigators generally discredit or discount entirely evidence contradicting the accused officer's account. Id.

84.     Second, BPD investigators compromise officer interviews by failing to probe beyond reports the accused officer already provided, and performing unrecorded "pre-interviews" with accused officers. Id. These pre-interviews compromise the integrity of an investigation. Likewise, there are numerous instances in which the interview of the accused officer merely consists of the officer orally reciting a prior written report, without IID investigators making any effort to probe beyond this oral recitation. Id. These interview techniques inhibit the function of IID investigators to obtain reliable information from officers accused of misconduct. Id.

85.     Third, BPD risks compromising investigations by providing accused officers with a detailed notice describing the alleged misconduct, often right after a complaint has been filed and before any investigation occurs.  The Department's own internal affairs audit identified these same potential problems in 2014. Id. The Department nonetheless continues to use its early notification practice. Id.

86.      The deficient nature of BPD investigations is the direct result of a lack of supervision and oversight by BPD leadership. Id. BPD supervisors fail to identify deficiencies or questionable findings in investigations and commanders consistently approve investigative

findings, even where investigative files are deficient or incomplete. Id. at 145. Nor do supervisors meaningfully review investigators' determinations about whether to sustain complaints. Id. Indeed, investigators are not required to have supervisors review and sign off on investigations that resulted in findings of "not sustained," although supervisors must approve an investigation that results in a finding of "sustained." Id.

87.     Deficiencies in BPD's complaint intake and investigation processes contribute to BPD's extremely low rate of sustaining allegations of officer misconduct, which in turn leads to a lack of discipline and accountability in the Department. Id. at 146. Discipline for allegations of serious misconduct is rare. Id. For example, of the 1,382 allegations of excessive force that BPD tracked from 2010 through 2015, only 31 allegations, or 2.2 percent were sustained. This was significantly lower than the amount of incident involving excessive force that can be identified from the same files. Id.

88.     Even in the rare instances in which a complaint is "sustained," the administrative process for imposing discipline permits the accused officer significant control over the disciplinary proceedings, further rendering the possibility of discipline unlikely. Id. at 147. Indeed, the common perception among BPD officer is that discipline is only imposed in situations covered by the press or in which the officer has crossed a supervisor, and is in no way connected to the actual magnitude of the misconduct involved. Id.

89.     The longstanding deficiencies in BPD's systems for investigating complaints has contributed to a cultural resistance to accountability that persists in the Department. The cultural opposition to meaningful accountability within the Department is reflected by the lack of discipline for serious misconduct and widespread violations of minor policy provisions; the failure to take action against officers with a known reputation for repeatedly violating

Department policy and constitutional requirements; and the reluctance of officers to report observed misconduct for fear that doing so will subject them to retaliation. Id. at 149-53.

## COUNT I
### (42 U.S.C. § 1983 – 14th Amendment)

90.     Plaintiff adopts and incorporates by reference the allegations contained in the foregoing paragraphs with the same effect as if herein fully set forth.

91.     Defendants Hendrix, Jenkins, and Palmere at all relevant times hereto, acted under color of State law.

92.     Defendants Hendrix, Jenkins, and Palmere deprived Plaintiff Harrod of his rights under the Fourteenth Amendment of the United States Constitution, said rights including freedom from summary punishment, his right of access to the courts, and his right to due process.

93.     At all times relevant hereto, Defendants Hendrix and Jenkins deliberately subjected the Plaintiff to the deprivation of his rights with actual or implied malice, using coercion to force a confession from the Plaintiff.  This treatment violated Harrod's right to be free from summary punishment as protected by the Fourteenth Amendment to the United States Constitution.

94.     The individual defendants manufactured, altered, destroyed, or covered-up evidence which rendered Plaintiff's ability to present his criminal defense effectively and adequately, interfering with his right of access to the courts as protected by the Fourteenth Amendment to the United States Constitution.

95.     Mr. Harrod sustained injuries as a direct and proximate result of the individual Defendants' violation of his rights, experiencing the loss of his freedom, emotional pain and suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000) plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000), and such other and further relief as the nature of the case requires.

### COUNT II
### (42 U.S.C. § 1983 – 4th Amendment)

96.     Plaintiff adopts and incorporates by reference the allegations contained in the foregoing paragraphs with the same effect as if herein fully set forth.

97.     Defendants Hendrix, Jenkins, and Palmere at all relevant times hereto, acted under color of State law.

98.     Defendants Hendrix, Jenkins, and Palmere deprived Plaintiff Harrod of his rights under the Fourth Amendment of the United States Constitution, said rights including freedom from unreasonable search and seizure, freedom from arrest without probable cause, and freedom from malicious prosecution without probable cause.

99.     At all times relevant hereto, Defendants Hendrix and Jenkins deliberately subjected the Plaintiff to the deprivation of his rights with actual or implied malice, searching, seizing and arresting him without reasonable suspicion or probable cause to do so, thereby injuring him and depriving him of his liberty as alleged.  This treatment violated Harrod's right

to be free from unreasonable search and seizure and arrest without probable cause as protected by the Fourth Amendment to the United States Constitution.

100.    Mr. Harrod sustained damages as a direct and proximate result of his unlawful search, seizure, false arrest and false imprisonment, as well as consciously experienced pain and suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000) plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000), and such other and further relief as the nature of the case requires.

## COUNT III
### (42 U.S.C. § 1983 – 4th Amendment *Monell* Claim)

101.    Plaintiff adopts and incorporates by reference the allegations contained in the foregoing paragraphs with the same effect as if herein fully set forth.

102.    Defendants Baltimore City and BPD failed to adequately train, supervise, and discipline their officers against arrest, imprisonment, and prosecution without probable cause. The failure to properly train, supervise, and discipline officers demonstrates a gross disregard for the constitutional rights of the public and the Plaintiff, and was a proximate cause of the injuries to Mr. Harrod.

103.    Baltimore City and BPD have instituted and maintained formal and informal customs, policies, and practices that foster, promote and encourage officers to arrest without probable cause.  Among those practices are the following:

a.      The use of arrest and imprisonment without probable cause occurs so frequently that it has become accepted manner by the Defendants and other employees of Baltimore City and BPD.  This is a result of Baltimore City and BPD's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that officers will not arrest and imprison citizens without probable cause and to ensure that allegations of false arrest and imprisonment will be thoroughly investigated and appropriately punished when found to have occurred.  As a result of this failure, there has been a regular pattern and practice of arrest and imprisonment without probable cause, and failure to investigate.  This pattern and practice has been manifested in other prior incidents involving city officers.

b.      Baltimore City and BPD have failed to effectively instruct officers that they have a duty to prevent and report arrest without probable cause when it occurs.

c.      Baltimore City and BPD have failed to keep accurate records as to the number of false arrests and imprisonments of citizens by members of its police force.  This policy encourages the use of arrest without probable cause in an improper manner and inhibits Baltimore City from critically evaluating the need for a change in training.

d.      Baltimore City and BPD lack an effective internal affairs procedure and has no meaningful system to control and monitor the recurrence of false arrest and testimony by officers who have a pattern or history of such behavior.

104.    The policies and customs of Baltimore City and BPD, as set forth herein, demonstrate a gross disregard for the constitutional rights of the public and the Plaintiff.  At the time of the injury to the Plaintiff, the Defendants were operating under unconstitutional customs, policies, and procedures.  These customs, policies, and procedures were a proximate cause of the injuries to Mr. Harrod.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000) plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000), and such other and further relief as the nature of the case requires.

## COUNT IV
### (42 U.S.C. § 1983 – 14th Amendment *Monell* Claim)

105.    Plaintiff adopts and incorporates by reference the allegations contained in the foregoing paragraphs with the same effect as if herein fully set forth.

106.    Defendants Baltimore City and BPD failed to adequately train, supervise, and discipline their officers against arrest and imprisonment on the basis of false, manufactured, destroyed, covered-up, or hidden evidence and false testimony.  The failure to properly train, supervise, and discipline officers demonstrates a gross disregard for the constitutional rights of the public and the Plaintiff, and was a proximate cause of the injuries to Mr. Harrod.

107.    Baltimore City and BPD have instituted and maintained formal and informal customs, policies, and practices that foster, promote and encourage officers to, manufacture, destroy, cover up, or hide evidence and offer false testimony.   Among those practices are the following:

a.    The manufacture, destruction, covering-up, and hiding of evidence and offer of false testimony occurs so frequently that it has become accepted manner by the Defendants and other employees of Baltimore City and BPD.  This is a result of Baltimore City and BPD's failure to establish effective procedures, rules, orders, guidelines and practices to ensure that evidence will not be manufactured, destroyed, covered-up, or hidden, to ensure no false

testimony is given, and to ensure that allegations to the contrary will be thoroughly investigated and appropriately punished when found to have occurred.  As a result of this failure, there has been a regular pattern and practice of the manufacture, destruction, cover-up, and hiding of evidence, offering of false testimony, and failure to investigate.  This pattern and practice has been manifested in other prior incidents involving city officers.

b.      Baltimore City and BPD have failed to effectively instruct officers that they have a duty to prevent and report the manufacture, destruction, cover-up, and hiding of evidence and offering of false testimony when it occurs.

c.      Baltimore City and BPD have failed to keep accurate records as to the number of instances of manufacturing, destroying, covering up, and hiding of evidence and of offering false testimony by members of its police force.  This policy encourages falsifying evidence and inhibits Baltimore City from critically evaluating the need for a change in training.

d.      Baltimore City and BPD lack an effective internal affairs procedure and has no meaningful system to control and monitor the recurrence of falsifying evidence by officers who have a pattern or history of such behavior.

108.    The policies and customs of Baltimore City and BPD, as set forth herein, demonstrate a gross disregard for the constitutional rights of the public and the Plaintiff.  At the time of the injury to the Plaintiff, the Defendants were operating under unconstitutional customs, policies, and procedures.  These customs, policies, and procedures were a proximate cause of the injuries to Mr. Harrod.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000) plus

interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000), and such other and further relief as the nature of the case requires.

## COUNT V
### (42 U.S.C. § 1985 Conspiracy to Interfere with Civil Rights)

109.    Plaintiff adopts and incorporates by reference the allegations contained in the foregoing paragraphs with the same effect as if herein fully set forth.

110.    The individual defendants conspired to deter the Plaintiff, by force, intimidation, or threat, from testifying freely, fully, and truthfully regarding his knowledge of the ownership of the handgun in question.  In doing so, they impeded, hindered, obstructed, or defeated the due course of justice with intent to deny to Plaintiff the equal protection of the laws.

111.    The individual defendants committed acts in furtherance of the object of such conspiracy, such as the planting of evidence, the coercive interrogation tactics, and the willingness to offer false testimony.

112.    Mr. Harrod sustained damages as a direct and proximate result of this conspiracy, was deprived of having and exercising the rights and privileges of a citizen of the United States, as well as consciously experiencing pain and suffering, humiliation, and embarrassment, all to his detriment.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000) plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial, but not less than Ten Million Dollars ($10,000,000), and such other and further relief as the nature of the case requires.

**JURY DEMAND**

Plaintiff demands a jury trial as to all claims so triable.


Respectfully submitted,

HANSEL LAW, PC


/s/_____
Cary J. Hansel (Bar No. 14722)
Justin Stefanon (Bar No. 20087)
2514 N. Charles Street
Baltimore, Maryland 21218
Phone:     301-461-1040
Facsimile: 443-451-8606
*Counsel for Plaintiff*