

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 JUL 21  PM 4: 16

CLERK'S OFFICE
AT BALTIMORE
DEPUTY

BY _____

U.S. Department of Justice

United States Attorney
District of Maryland

| | | |
|---|---|---|
| Leo J. Wise | Suite 400 | DIRECT: 410-209-4909 |
| Assistant United States Attorney | 36 S. Charles Street | MAIN: 410-209-4800 |
| Leo.Wise@usdoj.gov | Baltimore, MD 21201-3119 | FAX: 410-962-3091 |

June 9, 2017

Harvey Bruner, Esq.
Harvey B. Bruner Co. LPA
700 W St. Clair Ave., Suite 110
Cleveland, OH 44113

Re:  *United States v. Evodio Hendrix*
Criminal NO. JKB-17-0106

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by June 16, 2017, it will be deemed withdrawn. The terms of the agreement are as follows:

## Offense of Conviction

1. The Defendant agrees to plead guilty to Count One of the indictment now pending against him in *United States v. Gondo, et al*, Cr. No. JKB 17-106, charging him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

   a.  First, that an enterprise existed as alleged in the indictment;

   b.  Second, that the enterprise affected interstate or foreign commerce;

1

   c. Third, that the defendant was associated with or employed by the enterprise; and

   d. Fourth, that the defendant knowingly and willfully became a member of the conspiracy.

<u>Penalties</u>

3. The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: a 20-year term of incarceration, 3 years of supervised release and a fine of not more than twice the gross proceeds derived from the offense. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

<u>Waiver of Rights</u>

4. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

   a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the

---

[1]    Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status.

i. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant

nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt. In addition, Pursuant to U.S.S.G. § 1B1.2 the parties stipulate and agree that the guideline for robbery should be used to calculate the Defendant's advisory guideline calculation.

|   |   |   |
|---|---|---|
| a. | Base Offense Level (U.S.S.G. § 2B3.1(a)) | 20 |
| b. | Firearm Possessed (U.S.S.G. § 2B3.1(b)(2)(C)) | +5 |
| c. | Physical Restraint To Facilitate Commission of Offense (U.S.S.G. § 2B3.1(b)(4)(B)) | +2 |
| d. | Loss > $20,000 (U.S.S.G. § 2B3.1(b)(7)(B) | +1 |

The parties also agree to the following adjustments to the offense level based on the defendant's role in the offense

|   |   |   |
|---|---|---|
| a. | Abuse of Position of Trust (U.S.S.G. § 3B1.3) | +2 |
| b. | Obstructing or Impeding the Administration of Justice (U.S.S.G. § 3C1.1) | +2 |
|   | Subtotal | 32 |

4

7. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent recognition and affirmative acceptance of personal responsibility for his criminal conduct.

8. This Office will make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty.

9. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

10. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

11. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

12. The Defendant and this Office have reserved the right to argue for any factor under 18 U.S.C. § 3553(a) that could take the sentence outside of the advisory guidelines range.

<u>Obligations of the United States Attorney's Office</u>

13. At the time of sentencing, this Office will recommend a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

14. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including any uncharged conduct.

<u>Restitution</u>

15. The Defendant agrees to the entry of a Restitution Order for the full amount of the victim's losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the

actual, total loss caused by the offense conduct. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

### Collection of Financial Obligations

16. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

17. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

18. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

### Waiver of Appeal

19. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

   b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed, including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised.

6

c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

20. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

21. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if

the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

Entire Agreement

22. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Stephen M. Schenning
Acting United States Attorney

By: _____

Leo J. Wise
Derek E. Hines
Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.


7 - 2 1- 17
_____
Date

_____
Evodio Hendrix


I am the Defendant's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.


7 - 21 - 17
_____
Date

_____
Harvey Bruner, Esq.


9

## ATTACHMENT A
## STATEMENT OF FACTS

It is agreed and stipulated that were the Government to proceed to trial in this case, it would prove, beyond a reasonable doubt, by admissible testimonial and documentary evidence the guilt of the Defendant on the charges of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d).

This Office and the Defendant understand, agree and stipulate to the following statement of facts and the Defendant acknowledges that it does not represent all the evidence the Government would have produced had the case proceeded to trial.

1. The Defendant, Evodio Hendrix ("HENDRIX"), joined the Baltimore Police Department ("BPD"), an agency of the State of Maryland whose jurisdiction covers Maryland's largest city, Baltimore, on April 2, 2009. The BPD constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4). The BPD engaged in, and its activities affected, interstate commerce.

2. The Gun Trace Task Force ("GTTF") was a specialized unit within the Operational Investigation Division of the BPD. The primary mission of the GTTF was the tracking and tracing of recovered firearms in order to identify and suppress the possession, purchasing, and trafficking of illegal firearms within Baltimore City, and to assist with the investigation and prosecution of firearms-related offenses.

3. HENDRIX was assigned to the GTTF on or about June 13, 2016.

4. The purpose of the BPD was to protect and preserve life, protect property, understand and serve the needs of the Baltimore City's neighborhoods, and to improve the quality of life in Baltimore City.

5. The purposes of HENDRIX and his co-defendants included violating the legitimate purposes of the BPD in order to enrich themselves through illegal conduct, including extortion, robbery and time and attendance fraud.

6. Among the means and methods by which HENDRIX and his co-defendants and others pursued their illegal purposes were the following:
   a. detaining individuals and stealing money, property and narcotics from them;
   b. entering residences and stealing money, property and narcotics from the owners and occupants of those residences;
   c. conducting traffic stops of vehicles and stealing money, property and narcotics from the vehicle occupants;
   d. swearing out false affidavits to obtain search warrants in order to steal money, property and narcotics;

10

   e.  preparing false and fraudulent official incident and arrest reports, reports of
       property seized from arrestees and charging documents to conceal the fact that
       HENDRIX and his co-defendants stole money, property and narcotics from
       individuals; and

   f.  defrauding the BPD and the State of Maryland by submitting false and
       fraudulent time and attendance records in order to obtain salary and overtime
       payments for times when HENDRIX and his co-defendants did not work.

7. HENDRIX agrees that he associated with the enterprise described in the indictment
   and knowingly became a member of the conspiracy described in the indictment.

## Robberies

8. HENDRIX admits that he participated in the robberies listed below, among others.
   Further, HENDRIX admits he was armed with his BPD service firearm during the
   commission of these robberies, that individual victims of the robberies were
   physically restrained to facilitate the commission of the offense, and that he authored
   false and fraudulent incident reports and other official documents in some cases in
   order to conceal his and his co-defendants' criminal conduct and otherwise obstruct
   justice.

   **a.  March 22, 2016, Robbery of O.S.**

9. On or about March 22, 2016, HENDRIX, JENKINS, TAYLOR and WARD, acting in
   their capacity as police officers, conducted a traffic stop and arrested O.S.

10. Following the arrest of O.S., HENDRIX, JENKINS, TAYLOR and WARD entered
    O.S.'s residence. HENDRIX, JENKINS, TAYLOR and WARD stole approximately
    $200,000 from a safe they opened and from two bags they seized, and property,
    including a Breitling men's wristwatch, valued at $4,000, from the location.

11. Following the search, HENDRIX, JENKINS, TAYLOR and WARD went to
    TAYLOR's house where JENKINS gave WARD and HENDRIX and TAYLOR a
    portion of the money stolen from O.S. HENDRIX received approximately $20,000.

   **b.  June 24, 2016, Robbery of M.M.**

12. On or about June 24, 2016, HENDRIX, GONDO, JENKINS and WARD, acting in
    their capacity as police officers, entered a residence where M.M. was staying with a
    SWAT team. When SWAT left, JENKINS, WARD and HENDRIX remained to
    execute a search warrant.

11

13. While HENDRIX and WARD were searching a bedroom, HENDRIX found a quantity of cash, which he stole.

14. Later that day, HENDRIX gave WARD a portion of the cash he stole from M.M.

### c. August 24, 2016, Robbery of A.F.

15. On or about August 24, 2016, WARD, JENKINS, GONDO, RAYAM, HENDRIX and HERSL, acting in their capacity as police officers, conducted a traffic stop of A.F. and detained him.

16. While A.F. was detained, HENDRIX stole cash from him.

17. HENDRIX later gave some of the cash that was taken from A.F. to WARD.

18. To conceal the robbery from authorities, WARD and HENDRIX did not prepare an incident report or Statement of Probable Cause regarding the traffic stop. HENDRIX and WARD did not submit to BPD the money they stole from A.F..

### Time and Attendance and Overtime Fraud

19. HENDRIX routinely submitted false and fraudulent individual overtime reports. On these reports, HENDRIX falsely certified that he worked his entire regularly assigned shift, when he did not, and that he worked additional hours for which he received overtime pay, when in truth and fact he had not worked all and in some cases any of those overtime hours.

20. HENDRIX engaged in these practices with the approval of and at the direction of his co-defendant Sergeant JENKINS. As of the officer-in-charge of the GTTF, and the unit that HENDRIX served in prior to joining the GTTF, JENKINS instructed HENDRIX and his co-defendants when to arrive for work, in many cases hours after his regular shift began, and also instructed HENDRIX and his co-defendants how much overtime to claim, including routinely directing them to claim more overtime than they had actually worked. This degree of coordination was necessary in order to conceal from BPD that the GTTF was overbilling for overtime. Specifically, it was necessary that members of the GTTF submit individual overtime reports for the same hours to create the illusion that HENDRIX and his co-defendants, who were working as a unit, where actually working.

21. HENDRIX submitted false and fraudulent overtime reports for himself and for his co-defendants who were members of the GTTF, with their knowledge and at their direction. His co-defendants also submitted false and fraudulent individual overtime reports, with his knowledge and at his direction, on his behalf. The practice at the GTTF was that if a sub-set of the GTTF had a gun arrest, all members of the GTTF,

regardless of whether they had actually participated in the arrest, would submit individual overtime reports, as if they did. On some occasions, this occurred when HENDRIX and his co-defendants were not working at all on the day of the arrest. In that circumstance, it was necessary for one of his co-defendants to submit the individual overtime report for HENDRIX, or for him to do it for one or more of them.

22. In submitting false and fraudulent individual overtime reports, HENDRIX acted with the intent to defraud the BPD and the citizens of the State of Maryland.

# EXHIBIT G



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| *Leo J. Wise* | *Suite 400* | *DIRECT: 410-209-4909* |
| *Assistant United States Attorney* | *36 S. Charles Street* | *MAIN: 410-209-4800* |
| *Leo.Wise@usdoj.gov* | *Baltimore, MD 21201-3119* | *FAX: 410-962-3091* |

June 9, 2017

Warren A. Brown, Esq.
The Law Office of Warren Brown
711 Saint Paul Street
Baltimore, Maryland 21202

> Re:     *United States v. Momodu Gondo*, Cr. No. JKB 17-106 and JKB 16-051

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by June 16, 2017, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>Offenses of Conviction</u>

1.  The Defendant agrees to the following:

    a.  to plead guilty to Count One of the indictment now pending against him in *United States v. Gondo, et al*, Cr. No. JKB 17-106, charging him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d);  and

    b.  to plead guilty to Count One of the Third Superseding Indictment now pending against him in *United States v. Shropshire, et al*, Cr. No. JKB 16-051, charging him with conspiracy to distribute and possess with intent to distribute 100 grams or more of a mixture or substance containing heroin, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B).

Revised 11/5/09

The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

    **a. Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d)**

    First, that an enterprise existed as alleged in the indictment;

    Second, that the enterprise affected interstate or foreign commerce;

    Third, that the defendant was associated with or employed by the enterprise; and

    Fourth, that the defendant knowingly and willfully became a member of the conspiracy.

    **b. Conspiracy to Distribute and Possess with Intent to Distribute a 100 Grams or More of a Mixture or Substance Containing Heroin in Violation of 21 U.S.C. §§ 846, 841(b)(1)(B).**

    First, the Defendant knowingly, willfully, and unlawfully agreed with one or more persons to distribute, and possess with intent to distribute, a mixture or substance containing heroin;

    Second, the Defendant knew that the conspiracy would distribute a detectable amount of heroin and the Defendant knew that the conspiracy would distribute ~~more than grams~~ of a mixture or substance containing heroin; and *100 grams or more* [handwritten annotations]

    Third, the participation by the Defendant was knowing and voluntary, and not by accident or mistake.

<u>Penalties</u>

3. The maximum sentences provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

    **a. Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d):** a 20-year term of incarceration, 3 years of supervised release and a fine of not more than twice the gross proceeds derived from the offense.

b. **Conspiracy to Distribute and Possess with Intent to Distribute a 100 Grams or More of a Mixture or Substance Containing Cocaine Base in Violation of 21 U.S.C. §§ 846, 841(b)(1)(B):** forty years imprisonment, with a five (5) year mandatory minimum, followed by a term of supervised release of at least four years, and a fine of $5,000,000.

In addition, the Defendant must pay a $100 special assessment for each count of conviction pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing (for a total of $200). This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked – even on the last day of the term – and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

<u>Waiver of Rights</u>

4. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

   a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status.

i. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

4

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

**a. Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d) as charged in *United States v. Gondo, et al*, Cr. No. JKB 17-106**

This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt. In addition, pursuant to U.S.S.G. § 1B1.2 the parties stipulate and agree that the guideline for robbery should be used to calculate the Defendant's advisory guideline calculation.

| | | |
|---|---|---|
| i. | Base Offense Level (U.S.S.G. § 2B3.1(a)) | 20 |
| ii. | Firearm Possessed (U.S.S.G. § 2B3.1(b)(2)(C)) | +5 |
| iii. | Physical Restraint To Facilitate Commission of Offense (U.S.S.G. § 2B3.1(b)(4)(B)) | +2 |
| iv. | Loss > $20,000 (U.S.S.G. § 2B3.1(b)(7)(B)) | +1 |

The parties also agree to the following adjustments to the offense level based on the defendant's role in the offense

| | | |
|---|---|---|
| i. | Abuse of Position of Trust (U.S.S.G. § 3B1.3) | +2 |
| ii. | Obstructing or Impeding the Administration of Justice (U.S.S.G. § 3C1.1) | +2 |

| | |
|---|---|
| Subtotal | 32 |

5

b. **Conspiracy to Distribute and Possess with Intent to Distribute 100 Grams or More of a Mixture or Substance Containing Heroin in Violation of 21 U.S.C. §§ 846, 841(b)(1)(B) as charged in *United States v. Shropshire*, et al, Cr. No. JKB 16-51**

    i.  Base Offense Level                       24
        (U.S.S.G. § 2D1.1(c)(6) – at least 100 G of Heroin)

7. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent recognition and affirmative acceptance of personal responsibility for his criminal conduct.

8. This Office will make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

9. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

10. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute. The Defendant and this Office have reserved the right to argue for any factor under 18 U.S.C. § 3553(a) that could take the sentence outside of the advisory guidelines range.

<u>Obligations of the United States Attorney's Office</u>

11. At the time of sentencing, this Office will recommend a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

12. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including any uncharged conduct.

## Restitution

13. The Defendant agrees to the entry of a Restitution Order for the full amount of the victim's losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Collection of Financial Obligations

14. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

15. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

16. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

## Waiver of Appeal

17. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

   b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed, including

7

the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised.

c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

18. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

19. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the

presentence investigation, and any other relevant information. The Defendant
understands that the Court is under no obligation to accept this Office's
recommendations, and the Court has the power to impose a sentence up to and including
the statutory maximum stated above. The Defendant understands that if the Court
ascertains factors different from those contained in the stipulation set forth above, or if
the Court should impose any sentence up to the maximum established by statute, the
Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound
to fulfill all of his obligations under this agreement. The Defendant understands that
neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise,
or representation as to what guidelines range or sentence the Defendant will receive. The
Defendant agrees that no one has made such a binding prediction or promise.

<u>Entire Agreement</u>

20. This letter supersedes any prior understandings, promises, or conditions between this
Office and the Defendant and, together with the Sealed Supplement, constitutes the
complete plea agreement in this case. The Defendant acknowledges that there are no
other agreements, promises, undertakings or understandings between the Defendant and
this Office other than those set forth in this letter and the Sealed Supplement and none
will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement,
please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____

Leo J. Wise
Derek E. Hines
Assistant United States Attorneys

9

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.


June 14, 2017
Date

Momodu Gondo
Momodu Gondo


I am the Defendant's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.


6-14-17
Date

Warren Brown, Esq.

10

## ATTACHMENT A
## STATEMENT OF FACTS

It is agreed and stipulated that were the Government to proceed to trial in this case, it would prove, beyond a reasonable doubt, by admissible testimonial and documentary evidence the guilt of the Defendant on the charges of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) and conspiracy to distribute and possession with intent to distribute 100 grams or more of a mixture or substance containing heroin, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B).

This Office and the Defendant understand, agree and stipulate to the following statement of facts and the Defendant acknowledges that it does not represent all the evidence the Government would have produced had the case proceeded to trial.

1. The Defendant, Momodu Gondo ("GONDO"), joined the Baltimore Police Department ("BPD") an agency of the State of Maryland whose jurisdiction covers Maryland's largest city, Baltimore, on November 29, 2005. The BPD constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4). The BPD engaged in, and its activities affected, interstate commerce.

2. The purpose of the BPD was to protect and preserve life, protect property, understand and serve the needs of the Baltimore City's neighborhoods, and to improve the quality of life in Baltimore City.

3. The purposes of GONDO and his co-defendants included violating the legitimate purposes of the BPD in order to enrich themselves through illegal conduct, including extortion, robbery and time and attendance fraud.

4. Among the means and methods by which GONDO and his co-defendants and others pursued their illegal purposes were the following:
   a. detaining individuals and stealing money, property and narcotics from them;
   b. entering residences and stealing money, property and narcotics from the owners and occupants of those residences;
   c. conducting traffic stops of vehicles and stealing money, property and narcotics from the vehicle occupants;
   d. swearing out false affidavits to obtain search warrants in order to steal money, property and narcotics;
   e. preparing false and fraudulent official incident and arrest reports, reports of property seized from arrestees and charging documents to conceal the fact that GONDO and his co-defendants stole money, property and narcotics from individuals;
   f. evading court proceedings involving arrestees from whom GONDO and his co-defendants stole money, property and narcotics in order avoid questioning regarding the stolen money, property and narcotics; and

    g. obstructing and evading law enforcement efforts to uncover their criminal conduct, including,

        i. alerting one another to potential investigations into their criminal conduct,

        ii. coaching one another to give false testimony to investigators from the Internal Investigations Division of the BPD,

        iii. turning off their body cameras to avoid recording law enforcement encounters with civilians in which they were participants; and

    h. defrauding the BPD and the State of Maryland by submitting false and fraudulent time and attendance records in order to obtain salary and overtime payments for times when GONDO and his co-defendants did not work.

5. GONDO agrees that he associated with the enterprise described in the indictment in *United States v. Gondo, et, al.,* Cr. No. JKB 16-485 and knowingly became a member of the conspiracy described in the indictment.

## Robberies

6. GONDO admits that he participated in the robberies listed below, among others. Further, GONDO admits he was armed with his BPD service firearm during the commission of these robberies, with the exception of the robbing of A.A. and T.C. described below, that individual victims of the robberies were physically restrained to facilitate the commission of the offense, and that he authored false and fraudulent incident reports and other official documents in some cases in order to conceal his and his co-defendants' criminal conduct and otherwise obstruct justice.

### a. March 11, 2015, Robbery of G.W.

7. On March 11, 2015, GONDO and co-defendant Jemell Rayam ("RAYAM") and Sergeant A, acting in their capacity as police officers, entered a residence where G.W. was staying.

8. While GONDO, Rayam and Sergeant A were searching a bedroom they discovered a large quantity of cash. GONDO, RAYAM and Sergeant A each took some of the cash. GONDO took between $8,000 and $10,000.

9. In order to conceal his criminal conduct from law enforcement, GONDO did not prepare an incident report that disclosed that he had seized this cash from G.W. and did not submit any of the money he had stolen from G.W. to BPD.

**b. July 31, 2015, Robbery of Z.N.**

10. On July 31, 2015, GONDO, RAYAM and Sergeant A, acting in their capacity as police officers, entered a residence where Z.N. was staying.

11. While GONDO and RAYAM were searching the house they discovered a quantity of cash. GONDO and RAYAM took some of the cash.

12. After they left the residence, GONDO, RAYAM and Sergeant A went to Mother's, a restaurant in Baltimore City, where RAYAM gave Sergeant A his portion of the stolen money.

13. In order to conceal his criminal conduct from law enforcement, GONDO did not prepare an incident report that disclosed that he had seized this cash from Z.N. and did not submit any of the money he had stolen from Z.N. to BPD.

**c. October 5, 2015, Robbery of A.A. and T.C.**

14. On October 5, 2016, GONDO and co-defendants RAYAM and Kyle Wells ("WELLS") robbed A.A. and T.C. A.A. was a drug dealer. WELLS told GONDO that A.A. had money and drugs in his apartment. WELLS told GONDO that he had learned this from co-defendant ANTOINE WASHINGTON. Prior to the robbery, GONDO and RAYAM placed a tracking device on A.A.'s car without court authorization so that they could rob A.A.'s apartment when he was not home.

15. On October 5, 2016, RAYAM and WELLS forcibly entered A.A.'s apartment while GONDO acted as a look-out. T.C. was in the apartment when RAYAM and WELLS entered. RAYAM was wearing a ski mask and WELLS had a bandana over his face. RAYAM was armed with a BPD-issued firearm when he forcibly entered the apartment.

16. RAYAM and WELLS stole a Rolex watch, a firearm, $12,000 to $14,000 in cash and 800 grams of heroin.

17. After the robbery, GONDO, RAYAM and WELLS split the money they had stolen. WELLS took the Rolex, the gun and the drugs. WELLS sold some of the drugs. RAYAM also sold some of the drugs and shared the proceeds with GONDO.

**d. February 10, 2016, Robbery of P.E.**

18. On February 10, 2016, GONDO, RAYAM and Sergeant A, acting in their capacity as police officers, entered a residence where P.E. was staying. When the officers

entered the residence, P.E. was counting a quantity of cash as he sat on his bed in his bedroom.

19. After taking P.E. downstairs, GONDO, RAYAM and Sergeant A stole some of the cash that P.E. had been counting.

### e. February 23, 2016, Robbery of B.C.

20. On or about February 23, 2106, GONDO, RAYAM and Sergeant A, acting in their capacity as police officers, executed a search and seizure warrant.

21. GONDO, RAYAM and Sergeant A stole $7,000 from B.C.'s bedroom after placing her in handcuffs. After the robbery, GONDO, RAYAM and Sergeant A split the money that had been taken from B.C.'s bedroom.

22. In order to conceal their illegal conduct, GONDO authored a false Incident Report for the arrest of B.C. and the search of the home where she was renting a room that was filed with the BPD. Above his signature, GONDO certified that, "I affirm and declare that the statements above are true to the best of my knowledge." Sergeant A approved the report. In that statement, GONDO and Sergeant A failed to disclose the $7,000 that had been stolen from B.C.'s bedroom. GONDO did not submit the $7,000 that was stolen from B.C. to the BPD.

### f. May 28, 2016, Robbery of A.C.

23. On or about February 23, 2106, GONDO, RAYAM and Sergeant A, acting in their capacity as police officers, executed a search and seizure warrant.

24. GONDO, RAYAM and Sergeant A stole at least $700 from A.C.'s bedroom, which they split at while executing the warrant.

25. In order to conceal his criminal conduct from law enforcement, GONDO did not prepare an incident report that disclosed that he had seized this cash from A.C.'s bedroom and did not submit any of the money he had stolen from A.C. to BPD.

### g. June 2016, Robbery and Subsequent Sale of Marijuana and a Firearm

26. In or about June 2016, GONDO, RAYAM and JENKINS conducted a car stop near the intersection of North Forest Park Avenue and Dickey Hill Road. Following the car stop, GONDO, RAYAM and JENKINS went to the driver's residence, without a warrant, and seized a 9 mm handgun and a pound of marijuana. JENKINS directed RAYAM to sell the handgun and the marijuana in order to pay off a drug debt RAYAM owed JENKINS.

14

27. GONDO arranged for an associate of his, who was a drug dealer, to buy the marijuana and the handgun. GONDO's associate paid RAYAM for the gun and marijuana and RAYAM shared the proceeds with GONDO.

### h. July 8, 2016, Robbery of R.H. and N.H.

28. On July 8, 2016, RAYAM submitted an affidavit, under oath, to a Maryland State Circuit Court Judge, asking for authorization to search R.H. and N.H.'s home. The affidavit falsely stated that "[o]n July 5, 2016 Sgt. Jenkins, Det. Rayam, and Det. Gondo conducted a full day of surveillance on [R.H.]. At approximately 0940 hrs. R.H. was observed exiting [his residence] and entering into his [vehicle]. At 1030 hrs. R.H. arrived at [a location in Elkridge, Maryland] and stayed for approximately 1 hr. and 20 min." GONDO and RAYAM were both at home in their residences when they claimed to be conducting surveillance of R.H.

29. On July 8, 2016, at approximately 3:00 p.m., GONDO called J.C. During the call GONDO said, "Hey John [J.C.], we're pulling them over." J.C. replied, "All right. I'm waiting on you." RAYAM said, "He [JENKINS] gave the order. We pull them over, bring them back to the academy. That's per, Sergeant Jenko [JENKINS]." J.C. then said, "All right. I got you. Hold on."

30. Shortly thereafter, GONDO and his co-defendants DANIEL HERSL and JEMELL RAYAM detained R.H. and N.H. without lawful authority at co-defendant WAYNE JENKINS' direction. R.H. and N.H. were stopped and were placed in handcuffs but GONDO and his co-defendants had no basis on which to arrest them. When RAYAM took R.H. out of his car, RAYAM asked him, "where's the money?" R.H. had approximately $3,400 on his person which RAYAM stole. RAYAM later gave GONDO a portion of the funds he stole from R.H. when R.H. was initially detained.

31. Also at co-defendant JENKINS's direction, GONDO and co-defendants HERSL and RAYAM then transported R.H. and N.H., without lawful authority, to a BPD office located on Northern Parkway in Baltimore, Maryland, referred to as the "barn" so that he could be interrogated.

32. At approximately 3:11 p.m., while R.H. were being transported to the Barn, GONDO called JENKINS. During the call, GONDO said, "Hey, what's up. We, ah, we headed down now [to a BPD off-site facility]. We got, um, got the package [R.H. is in custody]." JENKINS said, "Hold on one second, hey, hey, he's [R.H.] in the car with you?" GONDO replied, "Yeah, I got, I got the, um, male [R.H.] and they got the female [N.H.]." JENKINS said, "Okay, hey, uh, did you tell them anything at all?" GONDO replied, "No." JENKINS continued, "All right. Just tell them you gotta wait for the U.S. Attorney ..." GONDO, "Yeah, we gonna meet up with you and [unintelligible]." JENKINS said, "Okay, and when I get there, treat me like I'm the

fucking U.S. Attorney. Like, hey Sir, how are you, we got our target in pocket. And then introduce me as the U.S. Attorney." GONDO said, "I got you."

33. Once at the barn and during this interrogation, R.H. told JENKINS that he had a large sum of money at his home in Westminster, Maryland, but denied having any drugs or guns.

34. JENKINS, RAYAM, GONDO and HERSL then transported R.H. and N.H. without lawful authority to their home.

35. Once at R.H. and N.H.'s home, GONDO, HERSL, JENKINS and RAYAM commenced searching the home before Carroll County arrived. GONDO and his co-defendants located a heat sealed package containing money and a sum of loose currency. GONDO and his co-defendants stole approximately $20,000 in loose currency, which they divided among themselves later in the evening at a bar in Baltimore City.

36. In order to conceal their illegal conduct, RAYAM authored a false Incident Report for the arrest of R.H. and N.H. and the subsequent search of their home that was filed with the BPD. Above his signature, RAYAM certified that, "I affirm and declare that the statements above are true to the best of my knowledge." JENKINS approved the report. In that statement, RAYAM and JENKINS failed to disclose the $3,400 that had been stolen from R.H. during the traffic stop and the $20,000 that was stolen from R.H. and N.H.'s home.

**Coaching One Another in Advance of Internal Investigation Division (IID) Interviews**

37. On or about September 7, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. GONDO asked RAYAM if he was going to the Internal Investigations Division (IID) to be interviewed. RAYAM told GONDO he had to give IID a report on the 15th. GONDO responded that he told "Sarge" not to, "say anything about the entry."

38. On or about September 13, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. They discussed how what is recorded on their body cameras will "come back to bite [them]." RAYAM told GONDO that he was going to meet up with Sergeant A. to "coach him" before he is interviewed by IID.

**Turning Off their Body Cameras**

39. On or about September 22, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. They discussed an incident where JENKINS was fighting with a civilian and "hit the phone out of her hand." GONDO told RAYAM, "I turned the camera off"

referring to his body camera. RAYAM responded, "Oh yeah, fuck that shit" and then said "so basically you were never here."

## Planning Additional Robberies

40. On September 22, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. RAYAM told GONDO, "He [JENKINS] told me about that, ah, he put me onto some big shit, yo, so I'm gonna start lookin' into this dude, I was tellin' him whatchu you goin' doin' in pockets [referring to robbing people of money they kept in their pockets], it's a fuckin' waste of time man . . . But he's just like, yo, you know, um, I got big dude, I was tired of putting my name on it, I was just goin' to give it to you motherfuckers." GONDO then asked if JENKINS provided the name of the "big dude" that they could rob. RAYAM responded,

> Naw, he said he's tired on puttin' his name on shit [referring to JENKINS putting his name on Statements of Probable Cause and other official BPD documents]. I was like, give me the motherfucker, I put my name on it . . . but then he was like, yo, this dude's good for at least two hundred [referring to $200,000], yo, we could get'em. I was like, ah right. He was like if we do it, you know, it'll be me and you, and I was like, alright, and G [referring to GONDO]. He was like yeah. And then I was like, well, what's up with the other dudes, your boys, you know [referring to HENDRIX, TAYLOR and WARD]. He was just like, nah, nah, they cool. I love them to death. Then he brought up the one where he, um, when they went outside and after everybody put up 20 dollars [meaning came away from the robbery with $20,000 each], you know what I'm talkin' about? Everybody was, he talked about the time where everybody had 20 g's [referring to $20 grand or $20,000].

GONDO responded, "you tellin' me he said that?" to which RAYAM then replied,

> He was just like, man, honestly, I [UI] even got that much. I put all that time and work, they [referring to HENDRIX, TAYLOR and WARD] was just with me, and I was like, you right. So I said you right, cause G [GONDO] knows, when I get something,' or if my name on it, I'm getting' the more, cause I'm the one, he was like, yup, you put so much time in it. So actually I think it should have been 60 [$60,000], 10 [$10,000], 10 [$10,000]and 10 [$10,000], that's what he said, or five [referring to $5,000 instead of $10,000] actually [referring to how the proceeds of a robbery should have been divided among JENKINS, and HENDRIX, TAYLOR and WARD]. I was like, I don't know about that. But, he was like, I'm tired of [UI]. I'm tired of doin' all this work. I was like, yo, that makes sense, yo. But, I'm gonna see what's up with this dude and shit. I told him, I asked him, how long you think it take to get

17

us, 'cause you know, I need 50 grand right now [referring to $50,000]. So
he say, how long you think its gonna take. I was like a month, naw, we do
it right, a couple of weeks. I was like, all right, I'll be hittin' him on them
slash days you give us."

RAYAM then told GONDO, "I need a big one."

### Alerting One Another to Investigations into their Criminal Conduct

41. On October 5, 2016, GONDO and RAYAM were in GONDO's BPD vehicle. The
two were discussing how JENKINS had received information that the GTTF was
under investigation. GONDO said that "people" had been saying GONDO was the
"biggest drug dealer in the department because he has money." GONDO described
how JENKINS had told him that JENKINS had heard that GONDO was on a wiretap.
GONDO said JENKINS told him it could be the "Feds" referring to federal law
enforcement investigating their illegal activities, and that the investigation could have
been on-going for five years, to which GONDO responded, "what case? It's no Pablo
Escobar. It's POLICE." GONDO then said, "King and Murray, it was like a year or
9 months, that's it, Sylvester, it was months, Nigga Richburg, it was months,"
referring to police officers, King, Murray, Sylvester and Richburg, who were
prosecuted for robbing civilians and the amount of time that GONDO believed they
were each under investigation.

### Time and Attendance and Overtime Fraud

42. GONDO routinely submitted false and fraudulent individual overtime reports. On
these reports, GONDO falsely certified that he worked his entire regularly assigned
shift, when he did not, and that he worked additional hours for which he received
overtime pay, when in truth and fact he had not worked all and in some cases any of
those overtime hours.

43. GONDO engaged in these practices with the approval of and at the direction of his
co-defendant Sergeant JENKINS. As of the officer-in-charge of the GTTF,
JENKINS instructed GONDO and his co-defendants when to arrive for work, in
many cases hours after his regular shift began, and also instructed GONDO and his
co-defendants how much overtime to claim, including routinely directing them to
claim more overtime than they had actually worked. This degree of coordination was
necessary in order to conceal from BPD that the GTTF was overbilling for overtime.
Specifically, it was necessary that members of the GTTF submit individual overtime
reports for the same hours to create the illusion that GONDO and his co-defendants,
who were working as a unit, were actually working.

44. GONDO submitted false and fraudulent overtime reports for himself and for his co-
defendants who were members of the GTTF, with their knowledge and at their

18

direction. His co-defendants also submitted false and fraudulent individual overtime reports, with his knowledge and at his direction, on his behalf. The practice at the GTTF was that if a sub-set of the GTTF had a gun arrest, all members of the GTTF, regardless of whether they had actually participated in the arrest, would submit individual overtime reports, as if they did. On some occasions, this occurred when GONDO and his co-defendants were not working at all on the day of the arrest. In that circumstance, it was necessary for one of his co-defendants to submit the individual overtime report for GONDO, or for him to do it for one or more of them.

45. In submitting false and fraudulent individual overtime reports, GONDO acted with the intent to defraud the BPD and the citizens of the State of Maryland.

### Aiding the Shropshire Drug Trafficking Organization

46. GONDO provided protection, information and tips to his co-conspirators about how to avoid being arrested. For example, on March 31, 2016, at approximately 5:03 p.m., co-defendant Antonio Shropshire ("SHROPSHIRE"), called GONDO and SHROPSHIRE greeted GONDO as "Poppy" and GONDO asked "What's up Brotha?" SHROPSHIRE responded, "Well, I got a question for you." GONDO said, "I'm listening" and SHROPSHIRE continued, "I took the car to the shop" and "And, uh, the thing was, the thing was lit," referring to a GPS tracking device that SHROPSHIRE had discovered attached to his vehicle when he took the vehicle to a repair shop. Investigators of the U.S. Drug Enforcement Administration had previously installed the device without SHROPSHIRE's knowledge. SHROPSHIRE then asked, "What to do with it?" GONDO asked how late the "shop" was open and then said, "I'm trying to see, run that by me one more time." SHROPSHIRE responded, "You know, you know what I'm talking about?" and GONDO said, "Yeah!" and "Yo just um, is this an iPhone?" SHROPSHIRE replied that he was using an iPhone, and then GONDO said, "Just FaceTime me, yo," referring to iPhone's videoconferencing feature, FaceTime, which enabled them to talk without risk of being intercepted by law enforcement, something GONDO knew as a law enforcement officer.

47. After communicating with SHROPSHIRE over FaceTime, on March 31, 2016, at approximately 5:21 pm, Detective GONDO placed an outgoing call to SHROPSHIRE in which he directed SHROPSHIRE to "get rid of" the GPS tracking device. During the call, Detective GONDO said, "Yeah basically when that, something like that happens yo, is basically, you know what I mean on, on the other side [law enforcement], you know it's just a loss [to law enforcement]. You feel me?" SHROPSHIRE said, "Right" and then GONDO continued, "But definitely, definitely somebody's been tracking you. So..." SHROPSHIRE said, "I'm gonna pop it on somebody else car [unintelligible]." GONDO, concerned about being intercepted over the phone, replied, "You know I don't even know who I'm talking to so whatever you do you do, but..." SHROPSHIRE responded, "Right" and GONDO continued, "Just be mindful, just be

19

mindful of that brother. So whatever you do." SHROPSHIRE again replied, "Right" and GONDO said, "But yeah you definitely gotta get rid of it. Alright?"

48. Following GONDO's instruction, SHROPSHIRE removed the DEA's GPS tracking device from his vehicle and placed it on another vehicle. On April 12, 2016, SHROPSHIRE called WELLS and said "I don't know what the fuck is going on" and WELLS asked, "is that good or bad?" and SHROPSHIRE told WELLS that things were "all bad" and arranged to meet face to face.

49. GONDO, using his status as a member of the GTTF obtained information about law enforcement operations near WELLS and passed law enforcement intelligence to WELLS to protect him. On June 27, 2016, at approximately 6:43 p.m., GONDO placed a telephone call to Officer 1, another Baltimore Police Department officer. GONDO said he was trying to "see where you all was at". Officer 1 replied, "Um, we over um, northeast [the northeast section of Baltimore] right now you. Um, I'm a send you a pin [location information] yo." GONDO was unsure what Officer 1 meant and Officer 1 explained, "A pin yo, like my location to my phone, my iPhone." An iPhone has a feature which allows the user to text the precise location (pin) on a map which shows the user's location. GONDO advised he understood and the call ended.

50. A few minutes later, on June 27, 2016, at approximately 6:55 p.m., GONDO placed a telephone call and WELLS answered, "Yo" and GONDO replied, "Woo, you got my text, yo?" referring to a text message he had sent WELLS identifying the location of Officer 1 who was conducting law enforcement operations. WELLS responded, "No" and GONDO said, "Alright, just look at your text yo, everything straight. Ahright." WELLS replied, "Alright." Based on the location coordinates of the officers, GONDO did not believe that WELLS should be concerned about getting arrested by law enforcement.

51. GONDO confirmed that WELLS had received his text message identifying the location of law enforcement, and GONDO and WELLS discussed law enforcement tactics of Officer 2, who GONDO knew was targeting WELLS. On June 28, 2016, at approximately 11:06 a.m., GONDO placed a telephone call to WELLS and GONDO asked, "You got the text though yesterday right [the text message GONDO sent WELLS the day before described in the previous paragraph]?" and WELLS responded, "Yeah, hell yeah, hell yeah." GONDO continued to discuss and explain specific tactics used by Officer 2 who was targeting WELLS, but GONDO assured WELLS that GONDO would protect him: "Yo, fool yo, so you know I'm hit your phone [alert WELLS to law enforcement's targeting of WELLS], man, that's like, yo, any, yo that real shit its bad [law enforcement are actively targeting WELLS], yo. Its bad, yo." WELLS replied, "I already know, yo, like. It's, man." GONDO told WELLS he would provide him with information about law enforcement: "I tell you man, yes sir! Yes! No question, yo. No question. Bad, yo, but anyway fuck that shit though man what the

fuck is up." WELLS replied, "Yeah, I already know its code red [there is law enforcement presence in WELLS' location]. I already know its code red." GONDO said, "Yeah, code red. It's bad, yo." WELLS said, "You know how it is, they [law enforcement] just running around going crazy." WELLS laughed and GONDO replied, "Going crazy, yo. That's how that nigger [Officer 2] is, yo. Real shit. That shit bad, yo." After GONDO confirmed that WELLS was ok, the call ended.

52. After GONDO told WELLS about law enforcement's efforts to detect WELLS' illegal activities, WELLS became suspicious of law enforcement attempting to arrange an undercover transaction involving WELLS. On July 5, 2016, at approximately 1:07 p.m., D.G., an associate, placed a recorded jail call to WELLS. During the conversation, WELLS brought up how he had received a text message that he suspected was from law enforcement. Specifically, WELLS said, "Somebody playing on my phone for real. Police, or somebody tryin' to rob a nigger." D.G. asked what he said and WELLS said, "Text the phone out of the blue, talkin' about whatever" and "I said who this [chuckles]? They like J." D.G. said, "J? Who the fuck" and WELLS said, "I'm lookin' at the phone like who the fuck is J [WELLS doesn't recognize the number that sent him the text messages]." WELLS told D.G. that WELLS asked, "Man, look, do you know who you are talkin' to?" WELLS then said the person who contacted him said, "Yo like, man yeah yo, I'm talkin' to yo with the dreads [WELLS]. I met you at the gas station, you told me to hit the phone. I'm tryin' to get straight [buy drugs]."

53. GONDO warned WELLS that GONDO believed the phone contacts came from Officer 2, who GONDO knew to be targeting WELLS. On July 5, 2016, at approximately 5:12 p.m., GONDO placed a telephone call to WELLS. After WELLS answered the phone, GONDO said, "That sound like [Officer 2], yo." WELLS replied, "That's the same thing I was saying, yo." GONDO said, "Yeah, he talk like that, yo. I ain't with him, yo. Me and whatchucallhim [Officer 3], we workin' on somethin' else, yo. Um, you know what I mean?" WELLS acknowledged and GONDO continued discussing Officer 2, "[unintelligible], that some shit he'd do, yo. I don't know that number, though." WELLS said, "It's one of those text back numbers, you can't call it." GONDO told WELLS how Officer 2 could call from an unknown number and explained, "Oh, so he probably do like, Google, some shit, or somethin'." WELLS said, "Every time you call it [the phone number], it [unintelligible]." GONDO continued, "Yeah, that did it was, when he was like, what was that shit. Dud da dah." WELLS replied, "What did it was when he say bitch. Bitch put me on to you [this phrase was what made WELLS think the texts were unusual]. I already thought it was [Officer 2] at first. Before we even got all way down to that [read the whole text message]." GONDO said, "Right." WELLS continued, "I already thought it was [Officer 2]." GONDO said, "This nigger crazy, yo. Yo, I'll pull him up [GONDO will talk to Officer 2 and deter Officer 2 from going after WELLS], yo."

54. GONDO contacted Officer 3 to confirm the phone contacts came from the law

21

enforcement officer who was targeting WELLS. On July 5, 2016, at approximately 6:32 p.m., GONDO received a telephone call from Officer 3 and Officer 3 said, "What the fuck is that, yo?" GONDO replied, "That's [Officer 2] texting Brill, from another phone, actin' like." Officer 3 said, "Whaaat?" Officer 3 continued, "Wow! Why he get his [WELLS'] number, yo?" GONDO said, "I mean, that's what they [the police] do. I mean, he, he, he already, you know what I mean, he the one who text me [WELLS forwarded the text messages to GONDO], that was his first thought. That was his first thought. Then I read how the text messages were stated, and I knew that was him [Officer 2], you know." Officer 3 asked, "Does he [Officer 2] got an informant that got his [WELLS'] number?" GONDO replied, "I mean, anybody could have gave him the guy's number. And he said he called the number back and it was like a Google number. You know like a made up number." GONDO and Officer 3 discussed how the wording of the text messages sounded like Officer 2. Officer 3 said, "Dude ain't gonna fuckin' just reach out to somebody he don't know [WELLS isn't going to arrange a drug transaction with someone he doesn't know]." GONDO replied, "Right. And then you see like, the black emojis and all that shit. You know what I mean." Officer 3 said, "What the fuck, yo."

55. GONDO told Officer 3 he was going to reach out to Officer 1 in order to try and protect WELLS. Concerned that WELLS and other co-conspirators could be apprehended by law enforcement, GONDO said, "I'm gonna pull [Officer 1] up first. Yeah, I gotta say something to [Officer 1], think, c'mon man, you been at my house, man. You seen that man there [Officer 1 has seen WELLS at GONDO's house]. Man know your face [WELLS knows Officer 1]. Ain't that crazy." Officer 3 said, "Yeah. You got, yeah, [unintelligible] 'cause Officer 1 be around, yeah." GONDO replied, "Yeah, they [GONDO and Officer 3 talk over each other] me and you not there. And that's what I said. I'm like, yo, we doin' somethin'. And you know, they not gonna go out here and really. They gonna try to get drugs. They goin' try to get drugs that early. You feel me? Probably try to set it up. Ain't nobody else doin' that textin' the phone type shit, you feel me? That's yo m.o.," referring to the way Officer 2 conducted law enforcement operations.

56. WELLS told D.G. that GONDO knew the specific officer that sent the text message to WELLS and was targeting him, and, in response, D.G. told WELLS to get rid of his phone. On July 6, 2016, at approximately 12:38 p.m., D.G. called WELLS and asked, "So, you say, somebody keep tryin' your phone, so you don't just block the number?" WELLS replied, "Yeah, you're right. I'm blocking for now, but I think it's the police and I don't want them to have that number at all." D.G. said, "Yeah" and WELLS continued, "Look, I sent it to the Cuzo [GONDO]. Cuzo say that look like [Officer 2's] work." D.G. said, "Oh, okay. You gotta get rid of that motherfucker. Fuck that. [unintelligible] clear of them people. Stay the fuck away from that nigger, man. D.G. and WELLS then discussed how the officer had tried to contact WELLS the day before, but WELLS' has blocked his number, and how now WELLS needed to get rid of his

22

phone to allude law enforcement and continue drug trafficking.

57. GONDO explained to WELLS that GONDO had told Officer 2 to stop targeting WELLS. On July 9, 2016, at approximately 1:52 a.m., GONDO placed a telephone call to WELLS and said, "Boy, I got in [Officer 2's] butt for you, yo!" WELLS replied, "Did you?" and GONDO said, "Oh my Gosh! C'mon, man. No question man. It's me, yo. I'm runnin' every light out here, man. Fuck these lights. No question, yo." WELLS said, "I appreciate it, sir." GONDO said, "You ain't have to appreciate shit, yo. You my brother." WELLS said, "I really do appreciate." GONDO and WELLS discussed whether it would be worth it for GONDO to go down to Miami. A little later in the call, WELLS said, "On another note, you know, the 19th, I'm be gone away from here for a little while sir [WELLS is going to prison]. But I expect to holler at you in between that. Somewhere, somehow."

58. GONDO admits that he knowingly became a member of the conspiracy described in the indictment in *United States v. Shropshire, et al*, Cr. No. JKB 16-051.

23