

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*



| | | |
|---|---|---|
| *Leo J. Wise* | *Suite 400* | *DIRECT: 410-209-4909* |
| *Assistant United States Attorney* | *36 S. Charles Street* | *MAIN: 410-209-4800* |
| *Leo.Wise@usdoj.gov* | *Baltimore, MD 21201-3119* | *FAX: 410-962-3091* |

January 2, 2018

Steven H. Levin
Levin & Curlett LLC
300 E. Lombard Street
Suite 1510
Baltimore, Maryland 21202

Re: *United States v. Wayne Jenkins*, Cr. No. 17-106 and Cr. No. 17-638

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by January 5, 2018, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>Offenses of Conviction</u>

1. The Defendant agrees to plead guilty to:

    **a. Cr. No. CCB 17-106:**

      i. Count One, charging him with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d)

      ii. Count Two, charging him with racketeering, in violation of 18 U.S.C. § 1962(c); and

      iii. Counts Three and Five, charging him with Hobbs Act Robbery, in violation of 18 U.S.C. § 1951

    **b. Cr. No. CCB 17-638:**

      i. Count One charging him with destruction, alteration, or falsification of records in a federal investigation, in violation of 18 U.S.C. § 1519; and

      ii. Counts Two through Five charging him with deprivation of rights under color of law, in violation of 18 U.S.C. § 242.

The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

2. The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

    a. **Cr. No. CCB 17-106**

        i. **Count One -- Racketeering Conspiracy, 18 U.S.C. § 1962(d)**
            (1) First, that an enterprise existed as alleged in the indictment;
            (2) Second, that the enterprise affected interstate or foreign commerce;
            (3) Third, that the defendant was associated with or employed by the enterprise; and
            (4) Fourth, that the defendant knowingly and willfully became a member of the conspiracy.

        ii. **Count Two – Racketeering, 18 U.S.C. § 1962(c)**
            (1) First, that an enterprise existed as alleged in the indictment;
            (2) Second, that the enterprise affected interstate or foreign commerce;
            (3) Third, that the defendant was associated with or employed by the enterprise;
            (4) Fourth, that the defendant engaged in a pattern of racketeering activity; and
            (5) Fifth that the defendant conducted or participated in the conduct of the enterprise through that pattern of racketeering activity.

        iii. **Counts Three and Five – Hobbs Act Robbery, 18 U.S.C. § 1951**
            (1) First, that the defendant knowingly obtained or took the personal property of another, or from the presence of another;
            (2) Second, that the defendant took this property against the victim's will, by actual or threatened force, violence, or fear of injury, whether immediately or in the future; and
            (3) Third, that as a result of the defendant's actions, interstate commerce, or an item moving in interstate commerce, was delayed, obstructed, or affected in any way or degree.

b.  Cr. No. CCB 17-638

  i.  **Count One -- Destruction, Alteration, or Falsification of Records in Federal Investigation, 18 U.S.C. § 1519**
    (1) First, that the defendant altered (or falsified or destroyed or mutilated or concealed or covered up or made a false entry in) any record, document, or object that can be used to record or preserve in-formation as alleged in the Indictment;
    (2) Second, that the defendant acted knowingly; and
    (3) Third, that the defendant acted with the intent to impede, obstruct or influence an investigation (or a matter) within the jurisdiction of (or in relation to or in contemplation of) a department or agency of the United States Government.

  ii. **Counts Two through Five – Deprivation of Rights Under Color of Law, 18 U.S.C. § 242**
    (1) First, that on or about the dates charged in the Indictment, the defendant acted under color of law;
    (2) Second, that in so doing, the defendant deprived, or caused to be deprived, U.B. and B.M., of their rights which are secured and protected by the Constitution and laws of the United States— that is, the right to be free from the deprivation of liberty without due process of law, which includes the right to be free from incarceration due to the fabrication of evidence by a law enforcement officer and the right to be free from incarceration due to a law enforcement officer's willful failure to disclose exculpatory evidence to a prosecutor; and
    (3) The defendant acted willfully.

<u>Penalties</u>

3.  The maximum sentences provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

a.  Cr. No. CCB 17-106

  i.  **Count One, Racketeering Conspiracy, 18 U.S.C. § 1962(d), and Count Two, Racketeering, 18 U.S.C. § 1962(c):** a sentence of not more than 20-year term of incarceration, 3 years of supervised release and a fine of not more than twice gross proceeds derived from the offense.

3

    ii.  **Counts Three and Five, Hobbs Act Robbery, 18 U.S.C. § 1951:** a sentence of not more than 20-year term of incarceration, 3 years of supervised release and a fine of not more than $250,000.

  b.  **Cr. No. CCB 17-638**

    i.  **Count One, Destruction, Alteration, or Falsification of Records in Federal Investigation, 18 U.S.C. § 1519:** a sentence of not more than 20-year term of incarceration, 3 years of supervised release and a fine of not more than $250,000.

    ii.  **Counts Two through Five, Deprivation of Rights Under Color of Law, 18 U.S.C. § 242:** a sentence not more than 1 year of incarceration, 3 years of supervised release and a fine of not more than $250,000.

4.  In addition, the Defendant must pay $900 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

<u>Waiver of Rights</u>

5.  The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

  a.  If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status.

i. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal

5

law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

### Rule 11 (c)(1)(C) Plea

6. The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of **240 to 360 months (20 to 30 years)** of incarceration is the appropriate disposition of this case. This agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to order forfeiture or restitution in an amount determined by the Court to be the loss in this case or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

### Advisory Sentencing Guidelines Apply

7. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

8. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt.

9. **Cr. No. CCB 17-106, Count One, Racketeering Conspiracy, 18 U.S.C. § 1962(d) and Count Two, Racketeering, 18 U.S.C. § 1962(c):** The parties agree that pursuant to U.S.S.G. § 1B1.2, "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." Similarly, pursuant to U.S.S.G. § 2E1.1(a)(2) & Application Note 1, because this is a case charging racketeering where there is more than one underlying offense, each underlying offense is

to be treated as if it were contained in a separate count of conviction for purposes of determining the base offense level. The parties agree that the advisory sentencing guidelines for racketeering conspiracy are U.S.S.G. § 2E1.1, the advisory sentencing guideline for the robberies charged in the Superseding Indictment are U.S.S.G. § 2B3.1 and the advisory sentencing guidelines for the overtime fraud charged in the Superseding Indictment are U.S.S.G. § 2B1.1. The parties further agree that in order to determine whether the base offense level should be 19 or the offense level from the underlying activity, Chapter 3, Parts A, B, C & D, must be applied. U.S.S.G. § 2E1.1(a)(2) & Application Note 1.

a. Group 1 – May 11, 2011, Robbery of W.B.
    i. U.S.S.G. § 2B3.1, Robbery
       1. Base Offense Level: 20
       2. Firearm Possessed: +5
       3. Physical restraint of victim: +2
    ii. Leader / organizer of criminal activity: +2 (2B1.1(c))
    iii. Abuse of trust: +2 (3B1.3)
    iv. Obstruction: +2 (3C1.1)
    v. Total: 33

b. Group 2 – July 11, 2014, Robbery of J.C.
    i. U.S.S.G. § 2B3.1, Robbery
       1. Base Offense Level: 20
       2. Firearm Possessed: +5
       3. Physical restraint of victim: +2
    ii. Leader / organizer of criminal activity: +2 (2B1.1(c))
    iii. Abuse of trust: +2 (3B1.3)
    iv. Obstruction: +2 (3C1.1)
    v. Total: 33

b. Group 3 – Spring 2015, Robbery at Belvedere Towers
    i. U.S.S.G. § 2B3.1, Robbery
       1. Base Offense Level: 20
       2. Firearm Possessed: +5
    ii. Leader / organizer of criminal activity: +2 (2B1.1(c))
    iii. Abuse of trust: +2 (3B1.3)
    iv. Obstruction: +2 (3C1.1)
    v. Total: 31

c. Group 4 – February 4, 2016, Robbery of M.S.
    i. U.S.S.G. § 2B3.1, Robbery
       1. Base Offense Level: 20
       2. Firearm Possessed: +5

      3.  Physical restraint of victim: +2
  ii.  Leader / organizer of criminal activity: +2 (2B1.1(c))
  iii.  Abuse of trust: +2 (3B1.3)
  iv.  Obstruction: +2 (3C1.1)
  v.  Total: 33

d.  Group 5 – March 22, 2016, Robbery of O.S. and K.H.
  i.  U.S.S.G. § 2B3.1, Robbery
    1.  Base Offense Level: 20
    2.  Firearm Possessed: +5
    3.  Physical restraint of victim: +2
    4.  Loss > $95,000: +2
    5.  Controlled dangerous substance taken: +1
  ii.  Leader/Organizer of Criminal Activity > 5 participants: +4 (3B1.1(a))
  iii.  Abuse of trust: +2 (3B1.3)
  iv.  Obstruction: +2 (3C1.1)
  v.  Total: 38

e.  Group 6 – July 8, 2016, Robbery of R.H. and N.H.
  i.  U.S.S.G. § 2B3.1, Robbery
    1.  Base Offense Level: 20
    2.  Firearm Possessed: +5
    3.  Physical restraint of victim: +2
    4.  Loss > $20,000: +1
  ii.  Leader / organizer of criminal activity: +2 (2B1.1(c))
  iii.  Abuse of trust: +2 (3B1.3)
  iv.  Obstruction: +2 (3C1.1)
  v.  Total: 34

f.  Group 7 – August 8, 2016, Robbery of D.A.
  i.  U.S.S.G. § 2B3.1, Robbery
    1.  Base Offense Level: 20
    2.  Firearm Possessed: +5
    3.  Physical restraint of victim: +2
    4.  Controlled dangerous substance taken: +1
  ii.  Leader / organizer of criminal activity: +2 (2B1.1(c))
  iii.  Abuse of trust: +2 (3B1.3)
  iv.  Obstruction: +2 (3C1.1)
  v.  Total: 34

g.  Group 8 – Time and Attendance Fraud (2B1.1)
  i.  Base Offense Level: 7

        ii.  Abuse of trust: +2 (3B1.3)
        iii.  Total: 9

  h.  Group 9 – Destruction, Alteration, or Falsification of Records in Federal Investigation (2J1.2)
      i.  Base Offense Level: 14
      ii.  Substantial interference with administration of justice: +3
      iii.  Offense involved selection of essential or especially probative record, document or tangible object to destroy or alter: +2
      iv.  Abuse of trust: +2 (3B1.3)
      v.  Total: 21

  i.  Group 10 – Deprivation of Rights Under Color of Law (2H1.1): Total 21

The parties agree that pursuant to U.S.S.G. § 3D1.4, groups 1-10 total 4 units. Therefore, 4 levels are added to the group with the highest offense level, which is Group 5, resulting in a total offense level of 41. Since 41 is higher than 19, pursuant to U.S.S.G. § 2E1.1, **42 is the total offense level.**

## 10. Cr. No. CCB 17-106, Count Three – Hobbs Act Robbery, 18 U.S.C. § 1951

  a.  U.S.S.G. § 2B3.1, Robbery
      i.  Base Offense Level: 20
      ii.  Firearm Possessed: +5
      iii.  Physical restraint of victim: +2
      iv.  Loss > $95,000: +2
      v.  Controlled dangerous substance taken: +1
  b.  Leader/Organizer of Criminal Activity > 5 participants: +4 (3B1.1(a))
  c.  Abuse of trust: +2 (3B1.3)
  d.  Obstruction: +2 (3C1.1)
  e.  **Total: 38**

## 11. Cr. No. CCB 17-106, Count Five – Hobbs Act Robbery 18 U.S.C. § 1951

  a.  U.S.S.G. § 2B3.1, Robbery
      i.  Base Offense Level: 20
      ii.  Firearm Possessed: +5
      iii.  Physical restraint of victim: +2
      iv.  Loss > $20,000: +1
  b.  Leader / organizer of criminal activity: +2 (2B1.1(c))
  c.  Abuse of trust: +2 (3B1.3)
  d.  Obstruction: +2 (3C1.1)
  e.  **Total: 34**

12. Cr. No. CCB 17-638, Count One -- Destruction, Alteration, or Falsification of Records in Federal Investigation, 18 U.S.C. § 1519: The parties agree that pursuant to U.S.S.G. § 2J1.2 the following is the applicable guideline calculations:
    a. Base Offense Level: 14
    b. Substantial interference with administration of justice: +3
    c. Offense involved selection of essential or especially probative record, document or tangible object to destroy or alter: +2
    d. Abuse of trust: +2 (3B1.3)
    e. **Total: 21**

13. **Cr. No. CCB 17-638, Counts Two through Five – Deprivation of Rights Under Color of Law, 18 U.S.C. § 242:** The parties agree that pursuant to U.S.S.G. § 2H1.1 the following is the applicable guideline calculations: pursuant to U.S.S.G. § 2H1.1(a)(1), **the base offense level is the offense level from the offense guideline calculation applicable to Count One of Cr. No. 17-638, which is 21.**

14. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office will make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. **These reductions result in the following adjusted offense levels as to the counts of conviction:**

    a. an adjusted offense level of 39 as to Counts One and Two of Cr. No. 17-106.

    b. an adjusted offense level of 35 as to Count Three of Cr. No. 17-106

    c. an adjusted offense level of 31 as to Count Five of Cr. No. 17-106

    d. an adjusted offense level of 18 as to Count One of Cr. No. 17-638.

    e. an adjusted offense level of 18 as to Counts Two through Five of Cr. No. 17-638.

15. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

16. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

17. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

18. The Defendant and this Office have reserved the right to argue for any factor under 18 U.S.C. § 3553(a) that could take the sentence outside of the advisory guidelines range.

19. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including any uncharged conduct.

## Restitution

20. The Defendant agrees to the entry of a Restitution Order for the full amount of the victim's losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

## Collection of Financial Obligations

21. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

22. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

11

23. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

## Waiver of Appeal

24. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

   a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

   b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed, including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised.

   c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

   d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

25. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it

12

will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

26. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

27. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Stephen M. Schenning
Acting United States Attorney

By: _____

Leo J. Wise
Derek E. Hines
Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

1/3/18
Date

Wayne Jenkins

I am the Defendant's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

3 JAN 2018
Date

Steve Levin, Esq.

## ATTACHMENT A
## STATEMENT OF FACTS

It is agreed and stipulated that were the Government to proceed to trial in this case, it would prove, beyond a reasonable doubt, by admissible testimonial and documentary evidence the guilt of the Defendant on the charges of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); racketeering, in violation of 18 U.S.C. § 1962(c); Hobbs Act Robbery, in violation of 18 U.S.C. § 1951; destruction, alteration, or falsification of records in federal investigation, in violation of 18 U.S.C. § 1519; and deprivation of rights under of color of law, in violation of 18 U.S.C. § 242.

This Office and the Defendant understand, agree and stipulate to the following statement of facts and the Defendant acknowledges that it does not represent all the evidence the Government would have produced had the case proceeded to trial.

1. The Defendant, Wayne Jenkins (JENKINS), joined the Baltimore Police Department ("BPD") an agency of the State of Maryland whose jurisdiction covers Maryland's largest city, Baltimore, on February 20, 2003.

2. The BPD constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4). The BPD engaged in, and its activities affected, interstate commerce.

3. Sworn members of the BPD must abide by the Law Enforcement Officer's Code of Ethics, which provides, in pertinent part:

   As a Law Enforcement Officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation; the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice. I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed both in my personal and official life, I will be exemplary in obeying the law and the regulations of my department ... I recognize the badge of my office as a symbol of public faith and I accept it as a public trust to be held so long as I am true to the ethics of police service. I will never engage in acts of corruption or bribery, nor will I condone such acts by other police officers. I will cooperate with all legally authorized agencies and their representatives in the pursuit of justice ... I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession ... law enforcement.

15

4. The Special Enforcement Section ("SES") of the BPD focused on investigating violent offenders, gangs, and gun crimes across Baltimore.

5. The Gun Trace Task Force ("GTTF") was a specialized unit within the Operational Investigation Division of the BPD. The primary mission of the GTTF was the tracking and tracing of recovered firearms in order to identify and suppress the possession, purchasing, and trafficking of illegal firearms within Baltimore City, and to assist with the investigation and prosecution of firearms-related offenses.

6. JENKINS was promoted to Sergeant on November 30, 2012. JENKINS became the officer-in-charge (OIC) of an SES unit on October 14, 2013. JENKINS became the OIC of the GTTF on June 13, 2016. JENKINS worked with co-defendants Momodu Gondo ("Gondo"), Evodio Hendrix ("Hendrix"), Daniel Hersl ("Hersl"), Marcus Taylor ("Taylor") Maurice Ward ("Ward") on the GTTF and, previously, with Hendrix, Taylor and Ward on the SES unit he led.

7. The purpose of the BPD was to protect and preserve life, protect property, understand and serve the needs of the Baltimore City's neighborhoods, and to improve the quality of life in Baltimore City.

8. The purposes of JENKINS and his co-defendants included violating the legitimate purposes of the BPD in order to enrich themselves through illegal conduct, including robbery and time and attendance fraud.

9. Among the means and methods by which the JENKINS, his co-defendants and others pursued their illegal purposes were the following:
    a. Beginning in 2015 when JENKINS was the OIC of an SES unit and continuing through when JENKINS became the OIC of the GTTF in 2016, JENKINS stole drugs from individuals who were temporarily detained and in some, but not all cases, arrested. In cases where a detainee was not arrested, JENKINS would tell them he was "cutting them a break," or words to that effect, and that he was not going to charge them but that he was seizing their drugs and would submit them to BPD. JENKINS would not then submit the drugs to BPD.
        i. Initially, JENKINS lied to Hendrix and Ward and told them he was submitting seized drugs to the evidence control unit, when, in truth and fact, he was not.
        ii. In order to conceal his conduct, JENKINS prepared false incident reports that did not disclose that drugs were seized from detainees and arrestees and, in some instances, did not prepare any documentation at all.

      iii.  Rayam took drugs from JENKINS and sold them through an associate
          and shared the proceeds with JENKINS.
      iv.  JENKINS also used other associates of his to sell drugs he stole from
          detainees and arrestees.

b.  Beginning in 2015 when JENKINS was the OIC of an SES unit and
continuing through when JENKINS became the OIC of the GTTF in 2016,
JENKINS stole money from detainees and arrestees. When conducting law
enforcement activities with Detectives Taylor, Hendrix and Ward, who were
members of the SES unit JENKINS led and later went with him to the GTTF,
JENKINS would take custody of money recovered from detainees and
arrestees and would keep a portion of it or all of it for himself. On occasions
when large amounts of cash were seized from arrestees and their homes,
JENKINS would share the proceeds with Taylor, Hendrix and Ward. Later,
when JENKINS became the OIC of the GTTF he also engaged in robberies
with Hersl and with Gondo and Rayam and shared the proceeds of those
robberies with them.

c.  JENKINS told detainees and arrestees that he was a federal task force officer,
which he was not, and told his co-defendants to identify him as the U.S.
Attorney, which he was not, in order to conceal his true identity when he
robbed detainees and arrestees.

d.  In order to conceal their criminal conduct, JENKINS and other members of
the conspiracy authored false incident and arrest reports or prepared no
paperwork whatsoever documenting their encounters with detainees and
arrestees. JENKINS and other members of the conspiracy created false
charging documents and made false reports of property seized from arrestees
to conceal the fact that the defendants stole money, property and narcotics
from individuals.

e.  In 2016, after he became OIC of the GTTF, JENKINS learned, at various
times, from sources within the BPD and from an Assistant State's Attorney,
that he and members of the GTTF were under investigation by federal law
enforcement. JENKINS shared that information with other members of the
GTTF. Taylor also learned from a source within the BPD Internal Affairs
Division that the GTTF was under investigation and Taylor conveyed this
information to at least one other member of the GTTF. Despite becoming
aware of this information, JENKINS and the other members of the conspiracy
continued to engage in criminal conduct.

f.  JENKINS and the other members of the conspiracy defrauded the BPD and
the State of Maryland by submitting false and fraudulent time and attendance
records in order to obtain salary and overtime payments for times when the
defendants did not work.

g.  When JENKINS, Gondo, Hendrix, Hersl, Rayam, Taylor and Ward were
detained in the Howard County Detention Center, JENKINS directed the

defendants to "keep their mouths shut" and "stick to the story," or words to that effect, in an effort to obstruct justice. Taylor and Hersl agreed to do so.

10. JENKINS agrees that he associated with the enterprise described in the Superseding Indictment; that he knowingly became a member of the conspiracy described in the Superseding Indictment; that he engaged in a pattern of racketeering activity; and that he conducted or participated in the conduct of the enterprise through that pattern of racketeering activity.

### Robberies

11. While serving as a BPD officer, JENKINS robbed civilians he detained and in some cases arrested, and stole money and drugs from them. JENKINS did this when he led an SES unit and later when he led the GTTF. At times, JENKINS shared the proceeds with co-defendants Gondo, Hendrix, Hersl, Taylor, Ward, and others, and on other occasions, he kept all of the proceeds for himself.

12. JENKINS admits that he participated in the specific robberies listed below, among others. Further, JENKINS admits he or other members of the conspiracy or he and other members of the conspiracy were armed with BPD service firearms during the commission of these robberies, that individual victims of the robberies were physically restrained in some cases to facilitate the commission of the offense, and that he authored or approved false and fraudulent incident reports and other official documents in some cases in order to conceal his and his co-defendants' criminal conduct and otherwise obstruct justice.

a   **May 11, 2011, Robbery of W.B.**

13. On or about May 11, 2011, then-Detective JENKINS and Detective Gondo, acting in their capacity as police officers, attempted a traffic stop of W.B. W.B. fled and eventually crashed his car and continued fleeing on foot. Gondo pursued W.B. on foot while JENKINS stayed with W.B.'s vehicle. Gondo ultimately caught W.B. and put him in handcuffs.

14. W.B. had at least $1,800 in his car, which JENKINS stole. JENKINS later shared the cash he stole with Gondo

15. To conceal his illegal conduct, on May 11, 2011, JENKINS authored a false Incident Report that was filed with the BPD. The Incident Report failed to disclose that any money was taken from the vehicle.

### b.  July 11, 2014, Robbery of J.C.

16. On or about July 11, 2014, Sergeant JENKINS and Detective Hendrix and Detective F., acting in their capacity as police officers, attempted a traffic stop of J.C. in the parking lot at Mondawmin Mall. J.C. attempted to flee, first in his car and then on foot, ultimately jumping over a retaining wall and falling to a lower level in the parking lot where he was injured.

17. After J.C. exited his vehicle and jumped over the wall, JENKINS and Hendrix stole between $12,000 and $14,000 from J.C.'s car.

18. JENKINS and Hendrix divided up the money in the parking lot of the BPD's Western District.

19. To conceal his illegal conduct, JENKINS did not report to BPD the $12,000 to $14,000 he seized from J.C.

### c.  Spring 2015, Robbery at Belvedere Towers

20. In or about spring 2015, Sergeant JENKINS and Detectives Taylor and Ward, while acting in their capacity as police officers, interrupted the sale of a large amount of marijuana in the parking lot of Belvedere Towers apartments in Baltimore City.

21. JENKINS took a bag containing 30 pounds of marijuana from the seller and a second bag containing $15,000 from the buyer. JENKINS falsely told the buyer and seller that he was a DEA agent and that he would let them go but that he might exercise his discretion to charge them in the future.

22. JENKINS then directed Taylor and Ward to a wooded area near the intersection of Northern Parkway and Liberty Road. JENKINS told Taylor and Ward to leave their phones in the car, in order to avoid detection from law enforcement, and to follow him into the woods. Once out-of-sight of the road, JENKINS opened the bag of money and gave Taylor and Ward approximately $5,000 each. JENKINS kept the rest of the money.

23. JENKINS also kept the 30 pounds of marijuana taken from the drug sale. JENKINS never submitted these drugs to BPD. Instead he gave the marijuana to D.S., who sold it for $2,000 a pound. D.S. gave JENKINS $30,000 from the sale.

24. To conceal his illegal conduct, JENKINS did not report the money or drugs he seized to the BPD.

### d. February 4, 2016, Robbery of M.S.

25. On or about February 4, 2016, Sergeant JENKINS and Detectives Ward and Hendrix, acting in their capacity as police officers, conducted a traffic stop of M.S., who was operating a taxicab at the time, and arrested him.

26. JENKINS, Ward and Hendrix stole approximately $1,500 to $2,000 from M.S.'s taxicab and split the money among themselves.

27. To conceal his illegal conduct, JENKINS did not report to BPD the $1,500 to $2,000 he seized from M.S.

### e. March 22, 2016, Robbery of O.S. and K.H.

28. On or about March 22, 2016, Sergeant JENKINS and Detectives Taylor, Hendrix, and Ward, acting in their capacity as police officers, conducted a traffic stop and arrested O.S. At the time of the arrest, the defendants also took O.S.'s house key and looked at his driver's license which identified the location of O.S.'s residence.

29. Following the arrest of O.S., JENKINS, Taylor, Hendrix, and Ward entered O.S.'s residence. O.S. and K.H.'s son was at their residence when JENKINS, Taylor, Hendrix and Ward arrived. K.H. who lived with O.S. at their residence, also came to the house while the co-defendants were present. JENKINS, Taylor, Hendrix and Ward stole money, including approximately $200,000 from a safe they opened and from two bags they seized, and property, including a Breitling men's wristwatch valued at $4,000 from the location.

30. JENKINS also stole 2 kilograms of cocaine from the location. JENKINS called D.S. and had him come to the vicinity of O.S.'s residence during the robbery. JENKINS met D.S. outside the house and gave him the 2 kilograms of cocaine JENKINS had stolen from O.S.'s basement. D.S. sold the 2 kilograms, over time, for $30,000 and gave JENKINS $15,000.

31. After the search, JENKINS, Taylor, Hendrix and Ward went to Taylor's house. In Taylor's basement, JENKINS gave Taylor, Hendrix and Ward, at least $20,000 each from the money that had been stolen from O.S. JENKINS kept at least $20,000 for himself.

32. To conceal their illegal conduct, JENKINS, Taylor, Hendrix and Ward did not report to BPD the more than $200,000 they seized from O.S.

### f. July 8, 2016, Robbery of R.H. and N.H.

33. On July 8, 2016, Rayam, Gondo and Hersl, all of whom were armed, initiated a traffic stop of R.H. and N.H. and placed them in handcuffs.

34. At approximately 3:11 p.m., Gondo called JENKINS. During the call, Gondo said, "Hey, what's up. We, ah, we headed down now [to a BPD off-site facility]. We go, um, got the package [R.H. is in custody]." JENKINS said, "Hold on one second, hey, hey, he's [R.H.] in the car with you?" Gondo replied, "Yeah, I got, I got the, um, male [R.H.] and they got the female [N.H.]." JENKINS said, "Okay, hey, uh, did you tell them anything at all?" Gondo replied, "No." JENKINS continued, "All right. Just tell them you gotta wait for the U.S. Attorney . . ." Gondo. "Yeah, we gonna meet up with you and [unintelligible]." JENKINS said, "Okay, and when I get there, treat me like I'm the fucking U.S. Attorney. Like, hey Sir, how are you, we got our target in pocket. And then introduce me as the U.S. Attorney." Gondo said, "I got you."

35. Following this call, JENKINS and Rayam interrogated R.H., in custody, at a BPD office. JENKINS falsely told R.H. that he was a federal officer. JENKINS and Rayam asked R.H. if he had any money in his residence and R.H. told them that he did.

36. JENKINS, Hersl, Rayam and Gondo, all of whom were armed, then transported R.H. and N.H. to their home in custody. Once at the house, JENKINS, Hersl, Rayam and Gondo located $70,000 in cash. Before officers from Maryland State Police (MSP) arrived to execute the search warrant, which was an out-of-jurisdiction warrant for the Defendants, JENKINS, Hersl, Gondo and Rayam stole $20,000 of the $70,000 located at the house. MSP recovered the remaining $50,000. No drugs or firearms or any other evidence of illegal conduct was recovered at R.H. and N.H.'s home and R.H. and N.H. were not charged with having committed any crime.

37. JENKINS also stole R.H.'s wristwatch. JENKINS gave that wristwatch to D.S. to sell.

38. Later that evening, at a bar in Baltimore, JENKINS, Hersl, Gondo, and Rayam met and split up $17,000 of the money they had stolen from R.H. and N.H. Gondo gave JENKINS his share and Hersl's share and JENKINS then gave HERSL his share.

39. In order to conceal their illegal conduct, Rayam authored a false Incident Report for the arrest of R.H. and N.H. and the subsequent search of their home that was filed with the BPD. Above his signature, Rayam certified that, "I affirm and declare that the statements above are true to the best of my knowledge." JENKINS approved the report. In that statement, Rayam and JENKINS failed to disclose the fact that an

additional $20,000 was seized from R.H. and N.H.'s home.

### g.  August 8, 2016, Robbery of D.A.

40. On or about August 8, 2016, Sergeant JENKINS and Detectives Hersl and J.C., acting in their capacity as police officers, conducted surveillance of D.A. leaving a storage facility. JENKINS, Hersl and J.C. pursued D.A. in their Baltimore City Police Department vehicle, and ultimately on foot, and arrested him. JENKINS, Hersl and J.C. then brought D.A. and his vehicle back to a location near the storage facility they had observed him leaving.

41. D.A. was taken from the scene in a police vehicle. JENKINS, Hersl, Gondo and Rayam then went to the storage facility where D.A. maintained a storage unit. Gondo and J.C. left the scene to prepare a search warrant for the unit, while JENKINS, Hersl and Rayam remained at the unit.

42. While JENKINS, Hersl and Rayam were waiting for J.C. to return with a search warrant for the unit, JENKINS called D.S. and told him to break into the storage unit and steal the contents. D.S. broke into the unit and recovered three-quarters of a kilogram of cocaine.

43. D.S. sold the cocaine and shared the proceeds with JENKINS. JENKINS also gave Hersl some of the proceeds of the sale of the cocaine.

44. To conceal his illegal conduct, JENKINS did not report to BPD the drugs he seized from D.A.'s storage unit.

### Illegal Searches

45. On multiple occasions, JENKINS and his co-defendants entered residences without a search warrant to search for firearms. Members of the GTTF referred to this practice as a "sneak and peak." If firearms were located, JENKINS and his co-defendants would then obtain a search warrant but would lie in the search warrant affidavit about the probable cause for the search or, at the very least, would fail to disclose that they had already entered the premises.

### Sales of Narcotics

46. In addition to the two instances described above, the March 22, 2016, robbery of O.S. and K.H. and the August 8, 2016, robbery of D.A., JENKINS gave D.S. drugs he stole from detainees and arrestees on multiple occasions, including cocaine, marijuana and heroin. D.S. was able to sell cocaine and marijuana that JENKINS gave him to his customers and shared the proceeds with JENKINS. JENKINS

brought drugs he stole from detainees and arrestees to D.S.'s home several times a week. His visits became so frequent, that D.S. gave JENKINS a key to D.S.'s shed which enabled JENKINS to leave the stolen drugs for D.S. at all hours of the day and night. After the drugs were sold, D.S. would give JENKINS half the sale proceeds. In total, D.S. paid JENKINS $200,000 to $250,000 for the drugs that JENKINS gave D.S. to sell.

47. While D.S. was able to sell cocaine and marijuana to his drug customers, he did not have customers interested in buying heroin. When JENKINS gave him heroin, D.S. would store it. Over time, D.S. accumulated approximately 200-300 grams of heroin. JENKINS gave that heroin to Rayam to sell. Rayam sold some of the heroin and shared the profits with JENKINS.

48. JENKINS also stole 4-5 boxes, containing approximately 12 pounds, of high-grade marijuana that had been intercepted by law enforcement from the U.S. mail. He gave that marijuana to D.S. who sold it for $2,000 to $3,000 a pound. D.S. split the proceeds of those sales with JENKINS.

49. In April 2015, following the riots after the death of Freddy Gray, JENKINS brought D.S. prescription medicines that he had stolen from someone looting a pharmacy so that D.S. could sell the medications.

### Breaking and Entering Homes

50. JENKINS broke into unoccupied houses to steal money, property and drugs.

51. JENKINS participated the execution of a search warrant in the home of a suspected drug dealer where $900,000 was seized in Baltimore County. After that search JENKINS placed an illegal tracker on the car of an individual that JENKINS believed was the drug dealer's supplier. JENKINS followed the driver to two residences. JENKINS broke into the first residence with D.S. and stole seven luxury watches, including 5 Rolexes and 2 Breitlings. In total, the watches were worth between $170,000 and $200,000. JENKINS then broke into the second house but did not find anything of value.

52. Following the robbery described above at O.S.'s residence, JENKINS identified an individual who he believed was O.S.'s drug supplier and broke into that individual's home with Hendrix. JENKINS did not find anything of value.

### Stealing from a Drug Dealer's Car

53. JENKINS put an illegal GPS tracking device that he obtained from D.S. on the car of a suspected drug dealer. JENKINS learned through law enforcement sources that the

suspected drug dealer had been pulled over and that he had $30,000 to $35,000 in his car but, because there were no drugs or other contraband in the car, he was released. JENKINS then followed the drug dealer's car, using the illegal GPS tracking device he placed on it, to a Sam's Club parking lot in Baltimore County. When the car was unoccupied, JENKINS sent D.S. to break into the car and steal any money in it.

54. D.S. broke into the car and retrieved $15,000 to $20,000, which he split with JENKINS.

## Stealing Illegally Operated Dirt Bikes

55. JENKINS stole dirt bikes, which cannot be legally operated in Baltimore City, from individuals riding the dirt bikes on city streets and then sold them through an associate.

## Alerting Members of the Conspiracy to Investigations into their Criminal Conduct

56. JENKINS learned that Gondo, Rayam, or both of them, were under investigation from other BPD officers and from an Assistant State's Attorney in the Baltimore City State's Attorney's Office. In approximately June 2016, JENKINS learned from a BPD officer that there was a federal wiretap on Gondo's phone. JENKINS shared this information with Hersl. Later on October 5, 2016, JENKINS spoke with an Assistant State's Attorney who told him that Rayam was under investigation for lying and stealing. JENKINS then shared that information with Rayam.

## Time and Attendance and Overtime Fraud

57. JENKINS routinely submitted false and fraudulent individual overtime reports. On these reports, JENKINS falsely certified that he worked his entire regularly assigned shift, when he did not, and that he worked additional hours for which he received overtime pay, when in truth and fact he had not worked all and in some cases any of those overtime hours.

58. As of the OIC of an SES unit and later the GTTF, JENKINS approved false and fraudulent overtime reports for other members of the conspiracy knowing that they were, in fact, false and fraudulent. The BPD relied on JENKINS as a supervisor, to only approve overtime reports when the officer submitting them had, in fact, worked the hours they claimed to have worked. JENKINS violated that trust by approving overtime reports that resulted in officers he was supervising receiving payments for time they did not work.

59. As of the OIC of an SES unit and later the GTTF, JENKINS also instructed his co-defendants when to arrive for work, in many cases hours after his regular shift began, and also instructed his co-defendants how much overtime to claim, including

routinely directing them to claim more overtime than they had actually worked. This degree of coordination was necessary in order to conceal from BPD that the GTTF was overbilling for overtime. Specifically, it was necessary that members of the GTTF submit individual overtime reports for the same hours to create the illusion that JENKINS and his co-defendants, who were working as a unit, were actually working.

60. JENKINS submitted false and fraudulent overtime reports for himself and for his co-defendants who were members of the GTTF, with their knowledge and at their direction. His co-defendants also submitted false and fraudulent individual overtime reports, with his knowledge and at his direction, on his behalf. The practice at the GTTF was that if a sub-set of the GTTF had a gun arrest, all members of the GTTF, regardless of whether they had actually participated in the arrest, would submit individual overtime reports, as if they did. On some occasions, this occurred when JENKINS and his co-defendants were not working at all on the day of the arrest. In that circumstance, it was necessary for one of his co-defendants to submit the individual overtime report for JENKINS, or for him to do it for one or more of them.

61. In submitting false and fraudulent individual overtime reports, JENKINS acted with the intent to defraud the BPD and the citizens of the State of Maryland.

## Planting Evidence on U.B. and B.M.

62. On April 28, 2010, JENKINS driving an unmarked BPD vehicle with Officer #2 as his passenger, and Officer #1, who was also driving an unmarked BPD vehicle, engaged in a vehicle pursuit of a car driven by U.B. B.M. was a passenger in the car driven by U.B.

63. At the intersection of Belle Avenue and Gwyn Oak Avenue, U.B., who was driving at a high speed, struck a car entering the intersection. The impact of the collision was so great that the car was pushed onto the front porch of a row house on the Southeast corner of the intersection. The car was operated by an elderly man and his wife was a passenger. The elderly driver was trapped in the car after the collision and died later that day.

64. JENKINS did not find any drugs in the car driven by U.B. immediately after the crash.

65. After the crash, and after U.B. and B.M. had been arrested, JENKINS told Officer #2 to call a Sergeant who was not at the scene because he had the "stuff" or "shit" in his car, or words to that effect.

66. Later, Officer #1 found approximately 28 grams of heroin in the vehicle. In fact, this heroin had come from JENKINS' police vehicle and had been planted in the car driven by U.B.

67. Later that day, JENKINS authored a false Statement of Probable Cause where he claimed that. "32 individually wrapped pieces of plastic containing a tan powder substance each weighing approximately one gram (all of which was suspected high purity heroin)" was recovered from U.B.'s car by Officer #1, when in truth and fact, JENKINS knew that the heroin in U.B.'s car had been planted. JENKINS signed the report under an affirmation that declared, "I SOLEMLY AFFIRM UNDER PENALTIES OF PERJURY THAT THE MATTERS AND FACTS SET FORTH IN THE FOREGOING DOCUMENT ARE TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF."

68. Following the incident, JENKINS listened to recorded jail calls of U.B. and B.M. JENKINS told Officer #2 that they were saying that the heroin recovered from the car had been planted on them. JENKINS told Officer #2 that JENKINS could not testify if the case went to trial because, "something had been put in the car" or words to that effect, referring to the heroin that had been planted in U.B.'s car.

69. JENKINS knew that U.B. and B.M. were subsequently charged with, and imprisoned for, federal drug charges for the heroin that had been planted in U.B,'s car.

70. Later, when JENKINS was the OIC of an SES unit and of the GTTF he told his co-defendants about this episode. JENKINS discussed carrying BB gun pistols so that he could plant them on a suspect if he could not find a firearm on the suspect. When JENKINS and the other members of the GTTF were arrested, BB gun pistols were recovered from their vehicles.

71. JENKINS admits that between in or about April 28, 2010, and November 30, 2017, he knowingly concealed, covered up and falsified and made false entries in an official Statement of Probable Cause in the District Court of Maryland for Baltimore City reflecting his actions, and actions of his fellow Baltimore Police Department officers, in relation to the seizure of heroin from an automobile operated by U.B. and in which B.M. was a passenger on April 28, 2010, with the intent to impede, obstruct and influence the investigation and proper administration of that matter, a matter within the jurisdiction of the United States Drug Enforcement Administration, a department and agency of the United States, or in relation to or contemplation of any such matter.

72. JENKINS admits that between in or about April 28, 2010, and in or about August 31, 2017, while acting under color of law, he willfully deprived U.B. of the right, secured and protected by the Constitution and laws of the United States, to be free from the deprivation of liberty without due process of law, which includes the right to be free from incarceration due to the fabrication of evidence by a law enforcement officer. Specifically, on April 28, 2010, the defendant submitted a false Statement of Probable Cause in which he claimed that drugs had been recovered from U.B.'s car, even

26

though JENKINS knew that the drugs were planted in the car; thereafter, JENKINS failed to correct his false statement during U.B.'s incarceration, which lasted until August 31, 2017.

73. JENKINS admits that between in or about April 28, 2010, and in or about September 9, 2013, while acting under color of law, he willfully deprived B.M. of the right, secured and protected by the Constitution and laws of the United States, to be free from the deprivation of liberty without due process of law, which includes the right to be free from incarceration due to the fabrication of evidence by a law enforcement officer. Specifically, on April 28, 2010, the defendant submitted a false Statement of Probable Cause in which he claimed that drugs had been recovered from B.M.'s car, even though JENKINS knew that the drugs were planted in the car; thereafter, JENKINS failed to correct his false statement during B.M.'s incarceration, which lasted until September 9, 2013.

74. JENKINS admits that between in or about April 28, 2010, and in or about August 31, 2017, while acting under color of law, he willfully deprived U.B. of the right, secured and protected by the Constitution and laws of the United States, to be free from the deprivation of liberty without due process of law, which includes the right to be free from incarceration due to a law enforcement officer's willful failure to disclose exculpatory evidence to a prosecutor. Specifically, the JENKINS willfully violated his ongoing obligation to disclose to a prosecutor the fact that he had lied in a Statement of Probable Cause that he knew would be relied upon, and that was in fact relied upon, to detain U.B.

75. JENKINS admits that between in or about April 28, 2010, and in or about September 9, 2013, while acting under color of law, he willfully deprived B.M. of the right, secured and protected by the Constitution and laws of the United States, to be free from the deprivation of liberty without due process of law, which includes the right to be free from incarceration due to a law enforcement officer's willful failure to disclose exculpatory evidence to a prosecutor. Specifically, the JENKINS willfully violated his ongoing obligation to disclose to a prosecutor the fact that he had lied in a Statement of Probable Cause that he knew would be relied upon, and that was in fact relied upon, to detain B.M.