## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**DEVON BERNARD HARROD**

    *Plaintiff*

v.                                                              Case # 1:18-CV-02542

**MAYOR AND CITY COUNCIL**
**BALTIMORE CITY**, *et al.*

    *Defendants*

---

### PLAINTIFF'S OPPOSITION TO DEFENDANT MAYOR AND CITY COUNCIL OF BALTIMORE'S MOTION TO DIMISS

COMES NOW Plaintiff, Devon B. Harrod, by and through undersigned counsel, and hereby files this opposition to Defendant Mayor and City Council of Baltimore's Motion to Dismiss, and in support thereof, states as follows:

### I.    INTRODUCTION

The State has effectively created impermissible immunity for the City for § 1983 claims arising from the City's control over its police force.   While this Court has recently addressed the liability of the Defendant City with regards to the control and function of the Baltimore City Police Department ("BPD"), from review of the prior claims asserted and briefed before this Court, Plaintiff did not find an analysis directly addressing the issue presented here—that the State is impermissibly immunizing the City from § 1983 liability.  As discussed in greater detail below, as the City acts contrary to its charter and has circumvented the Code of Public Local laws of Baltimore City, Art. 4 § 16-2 in exercising control over the BPD, the BPD is, for all intents and purposes, an agency of the City—taking direction from, following policies of, and being under the direct supervision of the City.

As the City effectively controls the BPD and its operations, the City must be held directly liable pursuant to *Monell*, for unconstitutional patterns and practices carried out by the BPD. *Monell v. Dep't of Social Serv.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978).

## II.   FACTS

On August 20, 2015, Plaintiff Devon B. Harrod ("Mr. Harrod") was illegally arrested by Gun Trace Task Force Officers of the Baltimore City Police Department. ECF 1, para. 11.  At approximately 10:00 p.m. that evening, Mr. Harrod had parked his vehicle, exited, and walked a short distance to speak with a friend. *Id.* at para. 12.  While Mr. Harrod was speaking with his friend, the two were approached by BPD Officers, Defendants Jenkins and Hendrix ("the officers"). *Id.* at para. 13.  The officers instructed Mr. Harrod to "walk off" and he complied. *Id.*

After walking away for a moment, Mr. Harrod returned to the area where the officers were located, near his vehicle, at which time he saw the officers searching his friend's car. *Id.* at para. 14.  The officers lied and stated that they had found a handgun in Mr. Harrod's friend's car and demanded that either Mr. Harrod or his friend claim ownership of it. *Id.* at para. 15.  The gun did not belong to either Mr. Harrod or his friend and neither of them had ever seen the weapon before. *Id.* at para. 15, 16.  The defendant officers began to interrogate both Mr. Harrod and his friend and while doing so, placed the gun against Mr. Harrod's friend's forehead as a threat. *Id.* at para. 18, 19.  The officers lied about finding the weapon and in fact planted it and then threatened both Mr. Harrod and his friend until one of them claimed ownership. *Id.* at para. 24.

Despite never being in possession of the weapon and despite the fact that he was threatened into making an admission of ownership, Mr. Harrod was charged with various gun possession offenses by the defendant officers of the Baltimore City Police Department Gun Trac Task Force.  *Id.* at para. 27.  After the federal indictment of the defendant officers for their

2

corruption and widespread, well-known, illegal activity, the false charges against Mr. Harrod were *nolle prosequed*, but only after Mr. Harrod wrongfully served thirteen (13) months for crimes which he did not commit. *Id.* at para. 29.  The defendant officers have both pled guilty to crimes asserted in their respective federal indictments. *Id.* at para. 30, 31.

The officers, at all times, were acting within the scope of their employment as Baltimore City Police Officers, answering to requests and demands of the Defendant Mayor and City Council of Baltimore ("Defendant City" or "City") and following the policies and practices established by the City. *Id.* at para. 42.

## III.   LEGAL STANDARD

In ruling on a Rule 12(b)(6) motion to dismiss, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Consequently, a motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  Furthermore, the court must "disregard the contrary allegations of the opposing party." *Gillespie v. Dimension Health Corp.*, 369 F. Supp. 2d 636, 640 (D. Md. 2005).

A motion to dismiss for failure to state a claim for relief should not be granted if the complaint is plausible on its face. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) *(citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  Thus, the defendant must prove that plaintiff's complaint does not allow the Court "to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1940. The law requires that, in order to maintain the motion as a motion to dismiss, the defendant must prove these elements without presenting evidence extrinsic to the plaintiff's complaint. Fed. R. Civ. P. 12(d). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

IV.     **ANALYSIS**

The Plaintiff's Complaint states actionable claims directly against the Defendant City and the Baltimore City Police Department ("BPD") for violations of Plaintiff's Constitutional Rights as established by the Court in *Monell v. Dep't of Social Serv.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). Given the City's recent actions and involvement in controlling the day to day operations and policies of the BPD, shielding the City from § 1983 liability for the constitutional violations committed therefrom directly undermines the holding in Monell and additional precedent establishing required municipal liability for such violations. In addition, the Complaint in this case readily sets forth the facts sufficient to meet the requisite elements for presenting such a claim. For the following reasons, the Defendant City's motion should be denied.

A.     **The State is Improperly Immunizing the City From § 1983 Liability.**

As was addressed in the case of *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, it is contrary to the holding in *Monell* to authorize or otherwise create immunity of a municipality for direct claims against it of § 1983 violations:

> unlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983. In short, a municipality can be sued under § 1983, but it cannot be held liable unless a municipal policy or custom caused the constitutional injury.

4

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166, 113 S. Ct. 1160, 1162, 122 L. Ed. 2d 517 (1993); *see also Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9, 15 (1st Cir. 1979) (noting that even before *Monell*, "the prevailing view was that municipal governments and local governmental bodies were not entitled to absolute immunity from liability under 42 U.S.C. § 1981.").

This Court has previously addressed the long-standing discussion of the BPD's legal status as a State Agency. *Estate of Anderson v. Strohman*, 6 F. Supp. 3d 639 (2014) (*citing Humbert v. O'Malley*, No. WDQ–11–0440, 2011 WL 6019689 (D. Md. Nov. 29, 2011); *Brown v. Tshamba*, No. RDB 11–00609, 2011 WL 2935037 (D. Md. July 18, 2011); *Mason v. Mayor & City Council of Balt.*, No. HAR 95–41, 1995 WL 168037 (D. Md. Mar. 24, 1995); *Wilcher v. Curley*, 519 F. Supp. 1 (D.Md.1980)); *Young v. City of Baltimore*, No. GLR 16-01321, 2017 WL 713860.  As established by the Acts of 1976 and implemented in 1978 (notably the same year that the Court decided the case of *Monell v. Dep't of Social Serv.*, imposing municipal liability for § 1983 violations), the State determined that the Mayor of the City of Baltimore would appoint the Police Commissioner- rather than the State Governor.  From that point forward, the State has been nearly completely removed from any authority over the BPD.

In *Mayor & City Council of Baltimore v. Clark*, the Maryland Court of Appeals addressed this structure within its own state, explaining that "as a matter of now long-standing practice, that the State undertakes virtually no oversight or supervision of the Police Department. This is not a criticism of the State. The disappearance of the oversight by the State became an essentially unavoidable reality after (1) in 1966, the City became the agency of government responsibility for appropriating money for the operating of the police department" and "(2) in 1976, the Mayor became responsible for appointing the Police Commissioner" and "[w]hat

remained, particularly after 1976, was an institutional configuration in which only city government could effectively and meaningfully oversee the Police Department." *Mayor & City Council of Baltimore v. Clark*, 404 Md. 13, 22, 944 A.2d 1122 (2008) (internal citations omitted).

The case of *Houghton v. Forrest* further discussed the discrepancy behind the Baltimore City Police Department being titled as a state agency as unlike other state agency employees, city officers are not entitled to protection from the Maryland Tort Claims Act ("MTCA") because "city police are not defined as state personnel for the purposes of the MTCA." *Houghton v. Forrest*, 412 Md. 578, 982 A.2d 223 (2010); *see* SG § 12-101(a). The General Assembly made this amendment to the MTCA purposefully to address the issue presented after the ruling in *Clea*, where the possibility that the state might be liable for a Baltimore City Police Department officer's tortious conduct because the Baltimore City Police Department is a state agency was presented. *Houghton v. Forrest*, 412 Md. at 578.

As recognized by the defense citing to the case of *Estate of Anderson v. Strohman*, this Court has addressed the "1980s-era cases" which conflate Eleventh Amendment analyses with the proper analysis of sufficient control necessary for § 1983 liability. ECF 12-1, pg. 5. That is not what is presented here. To the contrary, since the date of those earlier cases first arising after the delegation to the Mayor of appointing the BPD Commissioner, the City's control over the BPD has continued to evolve and expand while the state's position has waned. *Mayor & City Council of Baltimore v. Clark*, 404 Md. at 22.

What is now presented between the City and the BPD is the direct power to control, influence, and determine the policies, procedures, and day to day operations of the Baltimore City Police Department by the City itself. This authority and control are exhibited through the

6

Defendant City's own pleadings in the recently filed case of *Mayor and City Council of Baltimore City, et al. v. Momodu Bondeva Keton Gondo*, Baltimore City Circuit Court, 24-C-18-004386.  In that case, the Defendant City seeks declaratory judgment of the court to hold that the officers of the Gun Trace Task Force, including the defendant officers in this case, were not acting within the scope of their employment and therefore, further request declaration that the City not be required to indemnify the officers for their actions. Ex. 1 (Excerpt of Declaratory Judgment Complaint, 24-C-18-004386, pgs. 1-6).

Paragraph eight (8) of the Declaratory Judgment Complaint explains that there exists a Memorandum of Understanding ("MOU") which details that "[L]egal counsel will be provided in any civil case when the plaintiff alleges that an employee [of the BPD] should be held liable for acts alleged to be within the scope of his employment and/ or his official capacity.  The City will provide indemnification to any member of the unit who is made a defendant in litigation arising out of the acts with[sic] the scope of his/her employment that results in a monetary judgment being rendered against the employee." Ex. 1, para. 8.  Despite the fact that the Defendant City's declaratory judgment action is meritless,[1] it nevertheless provides a further example of the evolution of the City's control over the BPD.  While there may have been a time when the City exerted little authority over the BPD or took little part in creating the binding

---

[1] The issue of scope of employment, one which must be decided in order to afford the relief sought by the Defendant City in the action cited, has long been held as being an issue of fact for the fact-finder on a case-by-case basis. *Barclay v. Briscoe*, 427 Md. 270, 283, 47 A.3d 560, 568 (2012) (explaining that "the issue of whether a particular act is within the scope of employment is properly decided by a jury."); *Drug Fair of Md., Inc. v. Smith,* 263 Md. 341, 346–347, 283 A.2d 392, 396 (1971) ("We recognize that the issue of whether a servant is acting within the scope of his employment is ordinarily a question for the jury but this is so, only if there is a factual dispute."); *Baltimore Consol. Ry. Co. v. Pierce*, 89 Md. 495, 43 A. 940, 942 (1899) ("The question whether the act of the servant complained of was done in furtherance of the master's business, within the scope of the servant's employment, is generally one of fact, to be determined by the jury."); *Tall v. Bd. of Sch. Comm'rs of Baltimore City*, 120 Md. App. 236, 254, 706 A.2d 659, 668 (1998) ("Ordinarily, the question of whether an employee's conduct is within the scope of employment is one for the jury.").

policies and procedures that govern the BPD, those prior analyses and holdings are in direct

conflict with the actual conduct of the Defendant City presented today.

Only as a matter of formality is the Baltimore City Police Department treated as a state

agency, however, when it comes to funding and decisions, it is the City of Baltimore that

maintains control. For all practical purposes, the City controls its police department as though the

BPD is a City agency. The city funds its budget, providing the BPD over five hundred million

dollars a year.  The Mayor hires the commissioner and takes an active role in implementing and

establishing procedures and policies for the BPD.  Indeed, in a letter drafted by the Mayor in

2015, former Mayor Stephanie Rawlings-Blake asserts control over the BPD, requesting a

federal investigation and taking credit for changing the "culture and practices" of the BPD

through the following efforts which she takes ownership of:

> The development in 2013 of a strategic plan for the Baltimore Police Department, commonly known as the "Wasserman Report." The plan detailed steps the police department would undertake to reduce crime, improve services, increase efficiency, redouble community engagement, and maintain the highest standards of accountability and ethical integrity.
>
> The dismantling of a police unit known as the Violent Crimes Impact Section, which had been the target of repeated citizen complaints for harassment and use of force.
>
> Holding a series of public safety town halls across each of Baltimore's nine police districts starting in March 2014.  Commissioner Batts and I [Mayor Stephanie Rawlings-Blake] solicited community input that was then incorporated into police department changes and reforms.  Those reforms have included new ethics and situational training aimed to help our police officers improve the quality of their interactions with citizens.
>
> Recruitment of the U.S. Department of Justice COPS Program in October 2014 to come to Baltimore and launch a collaborative process to further enhance reforms.
>
> Adoption of a new schedule for patrol officers that puts more officers on the streets during peak times and enables a faster response to citizen calls.  With this new schedule in place, Commissioner Batts was able to order all officers to spend at least a portion of each shift walking through the communities they patrol, allowing the development of deeper relationship between officers and the citizens they protect.

Appointment of a body camera working group in October 2014 that produced
substantive recommendation to bring that technology to the Baltimore Police
Department.  We are now moving into a procurement process that will have a
body camera pilot program in operation in Baltimore by the end of 2015.

Ex. 2, Letter to Attorney General from Mayor of City of Baltimore.

In a public address, former Mayor Stephanie Rawlings-Blake described the Mayor's role

and oversight of the BPD, stating, "I approve high-level requests for promotions; we talk

strategy" and "I'm in constant conversation with the commissioner around the outcomes and

making sure that there's a significant engagement at every level to make sure that we continue

focusing on having a safer city."[2]  In a press release, the Mayor was quoted as taking credit for

new programs within the BPD and creating new strategies, "Today, we [Stephanie Rawlings-

Blake and BPD] announced the next step in our ongoing efforts to create a more efficient and

responsive police force," said Mayor Rawlings-Blake. "This innovative new deployment strategy

will give us the agility to ensure that communities have the manpower and resources they need—

when they need them." Ex. 3 (Press Release, https://mayor.baltimorecity.gov/news/press-

releases/2015-01-09-new-police-schedule-announced).

Baltimore Police Officers are entitled to the following benefits through their

employment: 1) benefits packages of the Baltimore City Government; 2) entitled to holidays of

the Baltimore City Government; 3) entitled to Baltimore City's retirement savings plan; 4)

termed as an agency of the City of Baltimore; 5) treated as an employee of the Baltimore City

Government; and 6) their salaries are paid and funded entirely by the city of Baltimore and not

the State of Maryland.  Additionally, the Baltimore City budget completely encompasses the

needs of the Baltimore Police Department.  Additionally, it is the city that is responsible for

---

[2] Audio of public address available through http://www.wypr.org/post/baltimore-police-state-agency-what-does-mean-consent-decree

paying the overtime of the officers, which is another budgetary consideration.

Moreover, the City takes credit for "[a] smarter police patrol schedule [that] matches deployments to crime activity and reduces overtimes costs." Fiscal 2016 Summary of the Adopted Budget City of Baltimore, Maryland (https://bbmr.baltimorecity.gov/sites/default /files/FY2016 SOTA Final.pdf.)  The Defendant City specifically states, "The *City* is currently implementing a new deployment schedule, in which officers work four ten hour shifts. The new schedule aims to increase police presence during peak hours, when the department experiences its highest call for service volume, and virtually eliminate staffing shortage overtime.." *Id*. (emphasis added).

Within its 2016 budgetary goals, it is also touted that "the City plans to reduce the workforce by an additional 280 positions, 211 of the position reductions are due to police contract negotiations…," thereby accounting for BPD officers as part of the City's workforce. *Id*. In addition, the City takes responsibility for implementing a hybrid pension system for Police Employees and police IT modernization. *Id*.

The City's control and conduct over the BPD can no longer be ignored or denied and continuing to allow the shielding of this municipality from § 1983 liability based upon such control is in directly conflicts with binding precedent. *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978); *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166, 113 S. Ct. 1160, 1162, 122 L. Ed. 2d 517 (1993).  For these reasons, the Defendant City's motion should be denied.

**B.     The *Monell* Claims Against the City Are Properly Pled.**

Counts III and IV are 42 U.S.C. §1983 claims under *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 98 S. Ct. 2018 (1978), which, as discussed above, held that a §1983 cause of action may lie against a local government when execution of the government's unconstitutional policy or custom causes injury.

For direct municipal liability to arise under § 1983 pursuant to *Monell*, a plaintiff must demonstrate that the government employee acted in accordance to a custom or policy of discriminatory practice. *Monell v. Dept. of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 690–695 (1978); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–36, 109 S. Ct. 2702, 105 L.Ed.2d 598 (1989).

In the case that conceptualized the doctrine, *Monell v. Dep't of Soc. Servs.*, the Supreme Court stated:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers [or for] constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision making channels.

*Monell v. Dep't of Soc. Servs.*, 436 U.S. at 659.

Courts have identified a variety of ways that a municipality can adopt a policy or custom sufficient to support liability under § 1983.  The unifying principle is that a municipality may only be held liable for its own violations of federal law.  There are four basic categories of municipal action Plaintiff may rely on to establish municipal liability: (1) express municipal policy; (2) adoption by municipal policymakers; (3) custom or usage; and (4) deliberate indifference.  *See Monell*, 436 U.S. at 690-94, 98 S. Ct. 2018.

Plaintiff's Complaint alleges injury resulting from the City's policy making and control over the BPD that resulted in inadequate training, discipline, or supervision of BPD officers. The City's direct actions amount to deliberate indifference to the rights of not only Mr. Harrod, but all those who come into contact with officers of the BPD, and such allegations are sufficient to withstand a motion to dismiss under "the liberal system of notice pleading" and in light of § 1983 cases including *Canton*, *Tuttle*, *Monell*, *Spell*, and others.  *See Canton v. Harris*, 489 U.S. 378, 390 (1989); *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985); *Monell v. Department of Social Servs.*, 436 U.S. 658, 690 (1978); *Spell v. McDaniel*, 824 F.2d 1380, 1385-86 (4th Cir. 1987)).

A municipality's failure to train, supervise, or discipline employees can render a municipality liable under § 1983, "when it can be said that the failure amounts to 'deliberate indifference towards the constitutional rights of persons in its domain.'"  *Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000) (*quoting City of Canton*, 489 U.S. at 388–89 & n. 7, 109 S. Ct. 1197).  This rule means "that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).

The Supreme Court acknowledges that there can be "single-incident liability" without the necessity to plead or prove a pattern of similar incidents.  Citing *Canton v. Harris*, 489 U. S. 378 (1989), the Court noted that:

> In Canton, the Court left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference. *Bryan Cty*., supra, at 409. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. *Canton*, supra, at 390, n. 10. Given the known frequency with which police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's

decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. *Bryan Cty.*, *supra*, at 409.

*Connick v. Thompson*, 563 U.S. 51 (2011).  Although other incidents and failures of training and supervision are alleged herein, no other incidents need be alleged or proven in cases involving unconstitutional failures to train.

The Supreme Court has held as follows:

. . .it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body-whether or not that body had taken similar action in the past or intended to do so in the future-because even a single decision by such a body unquestionably constitutes an act of official government policy….But the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell* 's language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy,"….and whose decisions therefore may give rise to municipal liability under § 1983….a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood.  More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-484, 106 S. Ct. 1292, 1298-1300 (1986).

There is no requirement that the Complaint cite any other specific incidents of misconduct.  *Canton v. Harris*, 489 U. S. 378 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. at 480-484.  Thus, the Complaint readily survives the present challenge.  Although the Plaintiff is but a single person, neither is he merely claiming a single incident of violation.

In *Amons v. District of Columbia*, Judge Walton held that the arrestee's allegations that the District of Columbia "tolerated and permitted a pattern of police harassment, false arrest, and malicious prosecution," that through its police department it "permitted and tolerated a pattern

and practice of unjustified, unreasonable, and unlawful harassment and deprivation of liberty and property without due process of law," and that its "policies and customs" encouraged police misconduct met the pleading standards necessary to state … claims under § 1983. *Amons v. District of Columbia*, D.D.C.2002, 231 F.Supp.2d 109. Plaintiff's allegations include specific averments with respect to a conscious choice by the Defendant City

To set forth a *Monell* claim for any of the four categorized theories established by the *Monell* court, a claimant must plead facts which: 1) identify the specific "policy" or "custom"; 2) fairly attribute the policy and fault for its creation to the municipality; and 3) show an "affirmative link" between the identified policy or custom and specific violation. *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

In this case, it is properly pled that the Defendants' failure to train, supervise, or discipline employees, which amounts to the deliberate indifference variety of *Monell* liability, was the cause for the violations of Mr. Harrod's rights. ECF 1, para. 52 ("In addition to failing to enact or enforce policy that would prevent such abuses of citizens' rights, Deputy Commissioner Palmere, Baltimore City, and BPD actively enforced and promoted policies that encouraged officers such as Hendrix and Jenkins to commit such abuses and subsequently protected officers from accountability for their violations of civil rights."). *See Monell*, 436 U.S. at 690-94; *Daskalea*, 227 F.3d at 441. It is also properly asserted that "The aforesaid policies, or lack thereof, by which the defendants condoned or displayed deliberate indifference to violations of rights and criminal actions of police officers have been exemplified in an August 10, 2016 report of the United States Department of Justice, exposing the widespread corruption and abuse within BPD." ECF 1, para. 54.

The Department of Justice's report on the widespread corruption and accepted practices within the BPD cited within the Complaint depict that such actions are directly attributable to the Defendant City's own action or inaction in remedying the customs of constitutional violations committed by its officers:

> The Department of Justice concluded that "there is reasonable cause to believe that BPD engages in a pattern or practice of conduct that violates the Constitution or federal law. BPD engages in a pattern or practice of:
> a. Making unconstitutional stops, searches, and arrest;
> b. Using enforcement strategies that produce severe and unjustified disparities in
> the rates of stops, searches and arrests of African Americans
> c. Using excessive force; and
> d. Retaliating against people engaging in constitutionally-protected expression."

ECF 1, para. 55 (quoting Investigation of the Baltimore City Police Department).

It is also cited within the Complaint that "BPD's systemic constitutional and statutory violations are rooted in structural failures. BPD fails to use adequate policies, training, supervision, data collection, analysis, and accountability systems, has not engaged adequately with the community it policies, and does not provide its officers with the tools needed to police effectively." ECF 1, para. 57 (quoting Investigation of the Baltimore City Police Department). These failures are ones for which the City has taken direct ownership and responsibility by controlling the budget, developing new strategies and policies, and overseeing the implementation of new initiatives. *Supra*, pgs. 8-10; Ex. 2; Ex. 3; Fiscal 2016 Summary of the Adopted Budget City of Baltimore, Maryland (https://bbmr.baltimorecity.gov/sites/default/files/FY2016 SOTA Final.pdf.)

Furthermore, again citing to the Department of Justice report provided as exhibit five (5) to the Complaint, the Complaint properly pleads the following:

58. … "[S]tarting in the late 1990s, Baltimore City and BPD leadership expressly adopted a policing model that embraced the principles of "zero tolerance" street enforcement.  According to City and BPD leaders, past and present, as well as media reports, Baltimore City based its approach in part on tactics developed by the New York Police Department and brought in consultants from NYPD's program to oversee its implementation in Baltimore."

59.     The strategy involved BPD officers making widespread use of pedestrian stops and searches in a purported effort to seize guns and narcotics and deter crime.  As part of the "zero tolerance" strategy, BPD leadership pressured officers to increase the number of arrests and to "clear corners," whether or not the officers observed criminal activity. Exhibit 5 at 41.

60.     BPD's implementation of "zero tolerance" resulted a massive increase in the quantity of arrests—but a corresponding decline in quality. For example, of the 100,000 arrestees that BPD processed through Central Booking in 2004, over 20% were released without charges.

ECF 1, para. 58-60 (quoting Investigation of the Baltimore City Police Department); *see also*

paras. 101-108.

The above demonstrates that the Defendant City 1) established policies and customs of

violating citizens' rights through 2) illegal searches and seizures, 3) in violation of citizens'

Fourth and Fourteenth Amendment rights.  *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir.

1987).  For these reasons, the Defendants motion to dismiss should be denied as the Plaintiff has

presented facts establishing viable *Monell* claims against the Defendants.

## V.     **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants'

Motion to Dismiss.

16

## CONDITIONAL REQUEST FOR HEARING

To whatever extent the court is not inclined to deny the relief on the papers, the Plaintiff requests a hearing.

Respectfully submitted,

___/s/_____
Cary J. Hansel (Bar No. 14722)
Erienne A. Sutherell (Bar No. 20095)
Hansel Law, P.C.
2514 N. Charles Street
Baltimore, Maryland
Phone:      301-461-1040
Facsimile: 443-451-8606
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of October, 2018, a copy of the forgoing was electronically served via the United States District Court for the District of Maryland filing system, providing service on all parties.

___/s/_____
Erienne A. Sutherell (Bar No. 20095)